# EXHIBIT 1

NORTH CAROLINA

ONSLOW COUNTY

ANTHONY BARBAGLIA,                          )
TARAJON BARBAGLIA, and                      )
MINORS B.B., A.B., and J.B., by and through )
Their parents Anthony Barbaglia and Tarajon )
Barbaglia,                                  )
                                            )
NICHOLAS BOWER,                             )
BRITTANY BOWER, and                         )
MINORS C.B.1 and C.B.2., by and through     )
Their parents Nicholas Bower and Brittany   )
Bower,                                      )
                                            )
KEVIN CASSARA,                              )
BIANCA CASSARA,                             )
MINORS B.C., H.C. and M.C., by and through  )          **COMPLAINT**
Their parents Kevin Cassara and Bianca Cassara, )
                                            )
ETHAN DOUTE,                                )
MICHELLE DOUTE, and                         )
MINORS N.D., P.D. and D.D., by and through  )
Their parents Ethan Doute and Michelle Doute, )
                                            )
MICHAEL HINRICHS,                           )
KIM HINRICHS, and                           )
MINORS A.H. and D.H., by and through        )
Their parents Michael Hinrichs and Kim Hinrichs, )
                                            )
SCOTT KEA,                                  )
SHELBY KEA, and                             )
MINORS H.K. and W.K., by and through their  )
Parents Scott Kea and Shelby Kea,           )
                                            )
DONOVAN MCTAGUE,                            )
MEREDITH MCTAGUE, and                       )
MINOR C.M., by and through parents Donovan  )
McTague and Meredith McTague,               )
                                            )
ANTHONY THOMASON,                           )
SAMANTHA SCONISH-THOMASON, and              )
MINOR R.ST., by and through parents Anthony )

1

Electronically Filed Date: 11/17/2025 5:02 PM  Onslow Superior Court County Clerk of Superior Court

Thomason and Samantha Sconish-Thomason,      )
                                             )
CANYON WILDER,                               )
KATE WILDER, and                             )
MINORS M.W.1. and M.W.2, by and through their )
Parents Canyon Wilder and Kate Wilder,       )
                    Plaintiffs,              )
                                             )
                                             )
vs.                                          )
                                             )
LEND LEASE (US) PUBLIC PARTNERSHIPS,         )
LLC, LEND LEASE (US) PUBLIC PARTNER-         )
SHIPS HOLDINGS LLC, LEND LEASE (US)          )
PPP, INC., LENDLEASE AMERICAS INC.,          )
HUNT MILITARY COMMUNITIES,                   )
HUNT COMPANIES, INC. HUNT MILITARY           )
COMMUNITIES MGMT., LLC, HBC                  )
PROPERTY MANAGERS, LLC, HUNT                 )
MH AMCC, LLC, GUGGENHEIM REAL                )
ESTATE, LLC, GUGGENHEIM PARTNERS             )
INVESTMENT MANAGEMENT HOLDINGS,              )
LLC, GUGGENHEIM PARTNERS INVEST-             )
MENT HOLDINGS, LLC, GUGGENHEIM               )
PARTNERS INVESTMENT MANAGEMENT,              )
LLC, OMAHA BEACH INVESTMENT                  )
HOLDINGS, LLC, CENTINEL PUBLIC               )
PARTNERSHIPS, LLC, CENTINEL                  )
CONSTRUCTION, LLC, WINN HOUSING              )
SERVICES LLC, WINN MANAGEMENT               )
COMPANY LLC, WINNRESIDENTIAL                 )
MANAGER CORP., WINN MANAGEMENT              )
GROUP LLC, NN MANAGER CORP, WR              )
SOUTH, LLC, WINNRESIDENTIAL                  )
MILITARY HOUSING SERVICES, AMCC              )
DEVELOPMENT MANAGEMENT LLC,                  )
AMCC MANAGING MEMBER LLC,                    )
ATLANTIC MARINE CORPS                        )
COMMUNITIES, LLC, and AMCC                   )
PROPERTY MANAGEMENT LLC,                     )
                    Defendants.              )
                                             )

2

## COMPLAINT

Plaintiffs, and their minor children, by and through their counsel, The Keenan Law Firm and The Mast Law Firm, bring the within Complaint against Defendants and in their support thereof, allege as follows:

## INTRODUCTION/PRELIMINARY STATEMENT

1. This case arises from Defendants' systematic failure to provide safe, habitable housing to military families at Marine Corps Base Camp Lejeune. Defendants prioritized profits over basic habitability standards, resulting in severe injuries and damages to Plaintiffs due to prolonged exposure to mold, water intrusion, and related environmental hazards within their leased homes.

2. Defendants are private entities that lease and manage military family housing for profit under the Military Housing Privatization Initiative ("MHPI"), 10 U.S.C. §§ 2871–2893. They acted throughout as private landlords and property managers, not as the United States or its instrumentalities.

3. Defendants' own contracts expressly adopt North Carolina law. Paragraph 10.K of the Atlantic Marine Corps Communities Lease Agreement provides that the Lease is governed by North Carolina law, including applicable landlord–tenant statutes and common law. The Lease further incorporates Community Guidelines and Addenda (the "Universal Lease Packet") requiring disclosure of hazards, compliance with state preservation requirements, and urgent remediation of water intrusion and mold. Collectively, these provisions confirm Defendants' voluntary submission to North Carolina landlord–tenant, consumer-protection, and disclosure laws.

3

4. Plaintiffs' claims are not barred by the federal enclave doctrine because they arise (a) under North Carolina common-law duties—negligence, fraud, habitability, and consumer-protection principles—that predate 1941; (b) under North Carolina statutory protections, including the North Carolina Unfair and Deceptive Trade Practices (UDTPA), N.C. Gen. Stat. § 75-1.1, that Defendants expressly incorporated into the tenancy and agreed to follow; and (c) from Defendants' voluntary contractual adoption of North Carolina law in the Universal Lease Packet.

## NATURE OF THE ACTION

5. Plaintiffs seek redress for personal injuries, property losses, and economic and emotional harm caused by Defendants' mismanagement of privatized military housing, including deceptive marketing, concealment of hazards, failure to remediate mold, and refusal to provide safe, habitable housing.

6. Plaintiffs assert claims for breach of contract, including breach of the implied warranty of habitability, negligence, common law fraud, negligent misrepresentation, North Carolina Unfair and Deceptive Trade Practices, breach of covenant of quiet enjoyment / constructive eviction, nuisance, violations of North Carolina Residential Rental Agreements Act, and for declaratory and injunctive relief.

7. Rather than provide quality housing, the Defendant Landlord and Property Management Companies knowingly concealed harmful housing conditions from unsuspecting military members and their families. The military families who lease the housing units effectively give up the full amount of their Basic Allowance for Housing ["BAH"] only to be placed in housing with dangerous and substandard conditions, including pervasive mold and other

4

toxins; deficient HVAC systems; and other unacceptable departures from applicable building and housing codes.

8. Military families who lease housing through the Military Housing Privatization Initiative depend on private landlords and property managers to provide safe, habitable housing that meets basic standards of health and safety. Defendants failed to meet these responsibilities, exposing Plaintiffs to serious health hazards.

9. These military members and their families seek to hold the Defendants responsible for the damages they suffered as a result of the Defendants' actions and inactions which caused these military members and their families to be exposed to mold conditions and other dangerous, toxic, and hazardous substances in the privatized military housing they leased from the Defendants.

## PARTIES

### A. <u>Plaintiffs</u>

10. Sergeant **Anthony Barbaglia** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Barbaglia, his spouse Tarajon Barbaglia, and their three minor children resided in a rental duplex home at 6930 Detroit, Tarawa Terrace, NC 28543, in the AMCC Watkins Village development.

11. In approximately January 2024, Sgt Barbaglia executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Barbaglia was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

5

12. Plaintiff **Tarajon Barbaglia** is the spouse of Sgt Barbaglia. During the pertinent times, Ms. Barbaglia held a possessory and occupancy interest in the property.

13. Plaintiffs **B.B., A.B. and J.B.** are the minor children of Anthony and Tarajon Barbaglia and lived at the property.

14. Sergeant **Nicholas Bower** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Bower, his spouse Brittany Bower, and their two minor children have resided in a rental duplex home at 6865 Boston Road, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

15. On November 15, 2023, Sgt Bower executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Bower was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

16. Plaintiff **Brittany Bower** is the spouse of Sgt Bower. During the pertinent times, Ms. Bower held a possessory and occupancy interest in the property.

17. Plaintiffs **C.B.1 and C.B.2** are the minor children of Nicholas and Brittany Bower and lived at the property.

18. Sergeant **Kevin Cassara** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Cassara, his spouse Bianca Cassara, and their three minor children resided in a rental duplex home at 6825 Baltimore, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

19. On August 30, 2023, Sgt Cassara executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During

6

the pertinent times, Sgt Cassara was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

20. Plaintiff **Bianca Cassara** is the spouse of Sgt Cassara. During the pertinent times, Ms. Cassara held a possessory and occupancy interest in the property.

21. Plaintiffs **B.C., H.C. and M.C.** are the minor children of Kevin Cassara and Bianca Cassara and lived at the property.

22. Sergeant **Ethan Doute** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Doute, his spouse Michelle Doute, and their three minor children resided in a rental duplex home at 6962 Detroit Road, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

23. In approximately January 2024, Sgt Doute executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Doute was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

24. Plaintiff **Michelle Doute** is the spouse of Sgt Doute. During the pertinent times, Ms. Doute held a possessory and occupancy interest in the property.

25. Plaintiffs **N.D., P.D. and D.D.** are the minor children of Ethan Doute and Michelle Doute and lived at the property.

26. Sergeant **Michael Hinrichs** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Hinrichs, his spouse Kim Hinrichs, and their two minor children resided in a rental duplex home at 7016 Boston Road, Tarawa Terrace,

7

NC 28543, 930 Detroit, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

27. In approximately August 2023, Sgt Hinrichs executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Hinrichs was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

28. Plaintiff **Kim Hinrichs** is the spouse of Sgt Hinrichs. During the pertinent times, Ms. Hinrichs held a possessory and occupancy interest in the property.

29. Plaintiffs **A.H. and D.H.** are the minor children of Michael and Kim Hinrich and lived at the property.

30. Sergeant **Scott Kea** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Kea, his spouse Shelby Kea, and their two minor children resided in a rental duplex home at 6860 Boston Road, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

31. In approximately August 2020, Sgt Kea executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Kea was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

32. Plaintiff **Shelby Kea** is the spouse of Sgt Kea. During the pertinent times, Ms. Kea held a possessory and occupancy interest in the property.

8

33. Plaintiffs **H.K. and W.K.** are the minor children of Scott Kea and Shelby Kea and lived at the property.

34. Sergeant **Donovan McTague** (Sgt) is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt McTague, his spouse Meredith McTague, and their minor child resided in a rental duplex home at 6862 Boston Road, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

35. In approximately December 2021, Sgt McTague executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt McTague was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

36. Plaintiff **Meredith McTague** is the spouse of Sgt McTague. During the pertinent times, Ms. McTague held a possessory and occupancy interest in the property.

37. Plaintiff **C.M.** is the minor child of Donovan and Meredith McTague and lived at the property.

38. Sergeant **Anthony Thomason** is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Thomason, his spouse Samantha Sconish-Thomason, and their minor child resided in a rental duplex home at 6973 Denver Road, Tarawa Terrace, NC 28543, in the AMCC Knox Landing development.

39. In January 2022, Sgt Thomason executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Thomason was a contracting party under the Form Lease, made

9

rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

40. Plaintiff **Smanatha Sconish-Thomason** is the spouse of Sgt Thomason. During the pertinent times, Ms. Sconish-Thomason held a possessory and occupancy interest in the property.

41. Plaintiff **R.ST** is the minor children of Anthony Thomason and Samantha Sconish-Thomason and lived at the property.

42. Sergeant **Canyon Wilder** is a servicemember with the United States Marine Corps ("Marines"). At all times material hereto, Sgt Wilder, his spouse Kate Wilder, and their two minor children resided in a rental duplex home at 5664 Allard Ct, Tarawa Terrace, NC 28543, in the AMCC Tarawa Terrace development.

43. On December 4, 2020, Sgt Wilder executed a Form Lease with Atlantic Marine Corps Communities LLC and AMCC Property Management LLC regarding the property. During the pertinent times, Sgt Wilder was a contracting party under the Form Lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

44. Plaintiff **Kate Wilder** is the spouse of Sgt Wilder. During the pertinent times, Ms. Wilder held a possessory and occupancy interest in the property.

45. Plaintiffs **M.W.1. and M.W.2** are the minor children of Canyon and Kate Wilder and lived at the property.

## DEFENDANTS, JURISDICTION AND VENUE

46. The Defendants include entities affiliated with Lend Lease, a multinational construction and property development corporation organized and headquartered in Australia; Hunt Companies, a real estate development and infrastructure firm headquartered in Texas; WinnCompanies, a property management and development company headquartered in Boston, Massachusetts; and the Atlantic Marine Corps Communities (AMCC) operating entities established for the ownership, management, and operation of privatized military housing at Marine Corps Base Camp Lejeune. Upon information and belief, Lend Lease, Hunt, and Winn, jointly with the AMCC operating entities, engaged in a venture to finance, develop, own, and operate the military housing at Camp Lejeune. In furtherance of this enterprise, the Defendants formed and employed a complex and opaque network of affiliated entities and subsidiaries, including the AMCC entities named herein, as more fully alleged below.

47. All Defendant have transacted business in the State of North Carolina, either directly or through their agents, servants, or employees, and has engaged in substantial and continuous activity within this State, such that the exercise of jurisdiction by this Court is proper pursuant to N.C. Gen. Stat. § 1-75.4.

48. Defendants have purposefully availed themselves of the privilege of conducting business in North Carolina by developing and managing residential rental properties in Onslow County North Carolina and this cause of action arises from those activities. Accordingly, this Court has personal jurisdiction over Defendant pursuant to N.C. Gen. Stat. § 1-75.4 and consistent with the Due Process Clause of the United States Constitution.

49. Defendant **Lend Lease (US) Public Partnerships LLC** is a Delaware limited liability company doing business in North Carolina. In March 2024, its sole managing member was

11

Lendlease Americas Inc. On March 11, 2025, it filed a Certificate of Amendment with the North Carolina Secretary of State changing its name from Lend Lease (US) Public Partnerships LLC to Centinel Construction LLC. Defendant obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01 and has continuously operated business activities at Marine Corps Base Camp Lejeune, North Carolina, maintaining an office at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547, for nearly 25 years. This entity may be served with process at its principal office at 1204 Demonbreun Street, Suite 800, Nashville, TN 37203; or c/o CT Corporation System, 160 Mine Lake Ct., Ste. 200, Raleigh, NC 27615-6417.

50. Defendant **Lend Lease (US) Public Partnerships Holdings LLC** is a Delaware limited liability company doing business in North Carolina. Lend Lease (US) Public Partnerships Holdings LLC is the sole member of AMCC Managing Member LLC. Defendant, through its ownership of AMCC Managing Member LLC, has engaged in continuous and systematic business activities in North Carolina by owning, managing, and operating privatized military housing at Camp Lejeune since approximately 2000. This entity may be served with process at its office address at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800, Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; or 200 Park Avenue, 9th Floor, New York, NY 10166.

51. Defendant **Lend Lease (US) PPP, Inc.** is a Delaware corporation doing business in North Carolina. Lend Lease (US) PPP, Inc. is the sole member of Lendlease Holdings. The members of Lend Lease (US) PPP, Inc. are Lend Lease (US) Public Partnerships, LLC and Lend Lease (US) PPP, Inc. Defendant has conducted substantial business in North Carolina through its ownership interests in entities operating at Camp Lejeune and has derived

12

significant revenue from housing operations in North Carolina. This entity may be served with process at its office address at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; 1201 Demonbreun Street, Suite 800, Nashville TN 37203; One Washington Mall, Suite 500, Boston MA 02108; or 200 Park Avenue, 9th Floor, New York, NY 10166.

52. Defendant **Lendlease Americas Inc.** is a Delaware corporation doing business in North Carolina. As the sole managing member of Lend Lease US Public Partnerships LLC (now Centinel Construction LLC), it exercised control over privatized military housing operations at Camp Lejeune until the January 2025 sale of the portfolio to Centinel Public Partnerships, LLC. This entity may be served with process at its principal office address at 200 Park Avenue, 9th Floor, New York, NY 10166; at its Nashville office at 1204 Demonbreun Street, Suite 800, Nashville, TN 37203; or c/o CT Corporation System, 160 Mine Lake Ct., Ste. 200, Raleigh, NC 27615-6417.

53. Defendant **Hunt Military Communities** operates and manages Camp Lejeune Family Housing under its brand name, maintains the website **www.camplejeunefamilyhousing.com**, provides leasing services through phone number 888-690-4304, and in October 2024 acquired Atlantic Marine Corps Communities, thereby assuming management of approximately 7,900 housing units at Camp Lejeune. Defendant maintains offices and employs management personnel at Camp Lejeune, North Carolina. This entity may be served with process at its principal office address at 601 North Mesa, Suite 1900, El Paso, TX 79901; at its office at 5401 Maryland Avenue, MCB Camp Lejeune, NC 28547; or c/o Capitol Corporate Services, Inc., 176 Mine Lake Ct., Ste. 100, Raleigh, NC 27615.

13

54. Defendant **Hunt Companies, Inc.** is a Delaware corporation. Defendant, through its subsidiary and affiliated entities, entered into a 50-year ground lease with the United States Marine Corps for privatized military housing at Camp Lejeune and has conducted continuous business operations in North Carolina related to this housing. This entity may be served with process at Capitol Services, Inc., 108 Lakeland Avenue, Dover, DE 19901.

55. Defendant **Hunt Military Communities Mgmt., LLC** is a Delaware Limited Liability company. Its sole member is HBC Property Managers, LLC. Defendant provides property management services at Camp Lejeune, North Carolina, including day-to-day operations, maintenance coordination, tenant relations, and lease administration for military housing units located in North Carolina. This entity may be served with process c/o Capitol Services, Inc., 108 Lakeland Avenue, Dover, DE 19901.

56. Defendant **HBC Property Managers, LLC** is a Texas Limited Liability company. Defendant, as the sole member of Hunt Military Communities Mgmt., LLC, has conducted business in North Carolina through its provision of management services for privatized military housing at Camp Lejeune. This entity may be served with process at its principal office address at 601 North Mesa, Suite 1900, El Paso, TX 79901; or c/o Capitol Corporate Services, Inc., 176 Mine Lake Ct., Ste. 100, Raleigh, NC 27615.

57. Defendant **HUNT MH AMCC, LLC** is a Delaware Limited Liability company. Defendant is the sole member of Atlantic Marine Corps Communities LLC and has conducted continuous business activities in North Carolina through ownership and operation of thousands of housing units at Marine Corps Base Camp Lejeune. This entity may be served with process c/o Capitol Services, Inc., 108 Lakeland Avenue, Dover, DE 19901.

14

58. **Guggenheim Real Estate, LLC** is a Delaware Limited Liability company. Its sole member managers is Guggenheim Partners Investment Management Holdings, LLC. Defendant acquired an ownership interest in the Camp Lejeune military housing portfolio in January 2025 through the $320 million purchase transaction and now derives revenue from housing operations in North Carolina. This entity may be served with process at its principal office address 231 S. Bemiston Ave., Suite 1250, Clayton, MO 63105; or c/o United Agent Group Inc., 15720 Brixham Hill Avenue #300, Charlotte, NC 28277.

59. **Guggenheim Partners Investment Management Holdings, LLC** is a Delaware Limited Liability company. Defendant, through its ownership structure, exercises control over Centinel Public Partnerships, LLC and conducts business in North Carolina through ownership of Camp Lejeune military housing operations. This entity may be served with process c/o United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

60. **Guggenheim Partners Investment Management, LLC** is a Delaware Limited Liability company. Defendant conducts business in North Carolina through its investment in and control over military housing operations at Camp Lejeune. This entity may be served with process c/o United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803.

61. **Omaha Beach Investment Holdings, LLC** is a Delaware Limited Liability company. Defendant holds an investment interest in the ownership structure of Camp Lejeune military housing and conducts business in North Carolina through this financial interest in housing operations located in this state. This entity may be served with process c/o Maples Fiduciary Services (Delaware) Inc., 4001 Kennett Pike, Suite 302, Wilmington, DE 19807.

15

62. Defendant **Centinel Public Partnerships, LLC,** is Delaware Limited Liability. Defendant acquired the U.S. military housing portfolio including Camp Lejeune in January 2025 and now owns and operates 10 housing communities including Camp Lejeune, employing management personnel and conducting continuous business operations in North Carolina. This entity may be served with process c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

63. Defendant **Centinel Construction LCC** is a Delaware limited liability company doing business in North Carolina. Its sole managing member is Lendlease Americas Inc. Defendant maintains management offices at Camp Lejeune and employs personnel who conduct day-to-day business operations in North Carolina. It may be served with process at its office address at 1201 Demonbreun Street, Suite 800, Nashville TN 37203; or c/o CT Corporation System, 160 Mine Lake Ct. Ste. 200, Raleigh, NC 27615-6417. Defendant is authorized to transact business in North Carolina and has obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01 and at all relevant times was operating a business within the state of North Carolina.

64. Defendant **Winn Housing Services LLC** is a Delaware Limited Liability company. Defendant provides housing services for military housing operations at Camp Lejeune, North Carolina. This entity may be served with process c/o Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

65. Defendant **Winn Management Company LLC** is a Delaware limited liability company. The sole member of Winn Management Company LLC is WinnResidential Manager Corp. Defendant, through WinnResidential Military Housing Services, operates approximately 6,183 privatized military homes at Camp Lejeune and provides on-site

16

property management services in North Carolina. This entity may be served with process at its principal office at One Washington Mall, Suite 500, Boston, MA 02108; or c/o Cogency Global Inc., 850 New B0urton Road, Suite 201, Dover, DE 19904.

66. Defendant **Winnresidential Manager Corp**. is a Massachusetts corporation. Defendant, through its ownership and control of entities providing property management services, conducts business in North Carolina at Camp Lejeune military housing. This entity may be served with process at its principal office at One Washington Mall, Suite 500, Boston, MA 02108; or c/o Gilbert Winn, One Washington Mall, Suite 500, Boston MA 02108.

67. Defendant **Winn Management Group LLC** is a Delaware limited liability company. The sole member of Winn Management Group LLC is Winn Manager Corp. Defendant, through its ownership and control of entities providing property management services, conducts business in North Carolina at Camp Lejeune military housing. This entity may be served with process at its office at One Washington Mall, Suite 500, Boston MA 02108; or c/o Gilbert Winn, One Washington Mall, Suite 500, Boston MA 02108.

68. Defendant **Winn Manager Corp** is a Massachusetts corporation. Defendant, through its ownership and control of entities providing property management services, conducts business in North Carolina at Camp Lejeune military housing. This entity may be served with process at its principal office at One Washington Mall, Suite 500, Boston, MA 02108; or c/o Gilbert Winn, One Washington Mall, Suite 500, Boston MA 02108.

69. Defendant **WR South, LLC** is a Delaware limited liability company that on information and belief has assisted Winn with regard to MCB Camp Lejeune. The sole managing member of WR South, LLC is Winnresidential Manager Corp. Defendant, through its ownership and control of entities providing property management services, conducts

17

business in North Carolina at Camp Lejeune military housing. WR South, LLC may be served with process at its office at One Washington Mall, Suite 500, Boston MA 02108; or c/o Cogency Global Inc., 2810 Coliseum Centre Drive, Charlotte, NC 28217.

70. Defendant **WinnResidential Military Housing Services** is a division or trade name of Winn Management Company LLC and/or its affiliated entities. Defendant provides day-to-day property management services at Camp Lejeune, employs maintenance staff in North Carolina, and has partnered with Lendlease/AMCC and now Centinel entities to manage military housing in North Carolina since approximately 2000. Service of process for claims against WinnResidential Military Housing Services may be affected through service upon Winn Management Company LLC at its principal office at One Washington Mall, Suite 500, Boston, MA 02108; or c/o Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

71. **AMCC Development Management LLC** is a Delaware Limited Liability company. Its sole managing member is Lendlease (US) Public Partnerships LLC. Defendant conducted development and management activities at Camp Lejeune military housing and employed personnel in North Carolina. This entity may be served with process at its principal office address c/o Lendlease (US) Public Partnerships LLC, 1201 Demonbreun Street, Suite 800, Nashville, TN 32703; or CT Corporation System, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417. Defendant is authorized to transact business in North Carolina and has obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01 and at all relevant times was operating a business within the state of North Carolina.

18

72. Defendant **AMCC Managing Member LLC** is a Delaware limited liability company doing business in North Carolina. The sole member of AMCC Managing Member LLC is Lend Lease (US) Public Partnerships Holdings, LLC. Defendant exercised management control over Atlantic Marine Corps Communities LLC and AMCC Property Management, LLC, conducting business in North Carolina through day-to-day oversight of Camp Lejeune housing operations. This entity may be served with process at its principal office address at c/o Lendlease (US) Public Partnerships LLC, 1201 Demonbreun Street, Suite 800 Nashville, TN 32703; or c/o CT Corporation System, 160 Mine Lake Court Suite 200, Raleigh NC 27615-6417; or c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

73. At all relevant times, Defendant **Atlantic Marine Corps Communities LLC** is a Delaware Limited Liability company. The sole member of Atlantic Marine Corps Communities LLC is HUNT MH AMCC, LLC. Defendant entered into written lease agreements with North Carolina residents that are governed by North Carolina law, collected rental payments from North Carolina residents, employed maintenance and management staff in North Carolina, and conducted all aspects of its landlord business within North Carolina. This entity may be served with process at its principal office address 601 North Mesa Suite 1900, El Paso Texas, 79901; or c/o Capitol Corporate Services, Inc., 176 Mine Lake Ct. Ste. 100, Raleigh, NC 27615. Defendant is authorized to transact business in North Carolina and has obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01 and at all relevant times was operating a business within the state of North Carolina.

74. Defendant **AMCC Property Management, LLC** is a Delaware Limited Liability company. Defendant employed on-site management and maintenance personnel at Camp

19

Lejeune, responded to tenant maintenance requests, conducted property inspections, coordinated repairs, and performed all day-to-day property management functions in North Carolina. Defendant is subject to the North Carolina Residential Rental Agreements Act, N.C. Gen. Stat. § 42-38 et seq. This entity may be served with process at its principal office address One Washington Mall, Suite 500, Boston, MA 02108; or c/o Cogency Global Inc., 2810 Coliseum Centre Drive Suite 120, Charlotte, NE 28217. Defendant is authorized to transact business in North Carolina and has obtained a certificate of authority from the North Carolina Secretary of State pursuant to N.C. Gen. Stat. § 55-15-01 and at all relevant times was operating a business within the state of North Carolina.

75. On information and belief, each Defendant is jointly and severally liable for the injuries and damages alleged in this Complaint based on one or more of the following legal theories:

76. Joint Venture and Joint Enterprise. At all relevant times, Defendants operated under an express or implied agreement to carry on the privatized military housing enterprise at Marine Corps Base Camp Lejeune. Defendants demonstrated their intent to be joint venturers through: (a) a community of interest reflected in their collective contribution of property, capital, services, effort, skill, and knowledge to the housing operations; (b) joint control and management of the housing development, ownership, maintenance, and leasing operations; and (c) sharing of profits and losses derived from the housing enterprise. Each Defendant, as a member of this joint venture, is vicariously liable for the negligent acts and omissions of its co-venturers committed during the course and scope of the joint enterprise.

77. Agency and Principal-Agent Relationships. At all relevant times, certain Defendants acted as agents, representatives, or servants of other Defendants in conducting the day-to-day

20

operations, management, maintenance, and leasing of the military housing at Camp Lejeune. These Defendants acted within the scope of their actual or apparent authority, and their principals are vicariously liable for their actions and omissions under the doctrine of respondeat superior and general principles of agency law.

78. Aiding and Abetting. Certain Defendants knowingly and substantially assisted, encouraged, or participated in the wrongful conduct of other Defendants alleged herein. These Defendants had actual knowledge of wrongful conduct, provided substantial assistance to facilitate such conduct, and are jointly and severally liable for the resulting injuries and damages.

79. Corporate Veil Piercing and Alter Ego Liability. In the alternative, and to the extent that the evidence shows and equity requires, at all relevant times there existed such unity of interest and ownership among Defendants and their predecessors, successors, parent companies, subsidiaries, and affiliates that any individuality and separateness between them has ceased to exist. These entities operated as a single business enterprise or instrumentality of one another, such that adherence to the fiction of separate corporate existence would promote injustice or inequitable consequences. Under North Carolina's instrumentality rule, each such entity exercised actual control, domination, and influence over the others to such a degree that the controlled entities had no separate mind, will, or existence of their own. This control and breach of duty proximately caused the injuries and unjust losses suffered by Plaintiffs. Therefore, the corporate veil should be pierced and each such entity may fairly be deemed the alter ego of the others.

80. Direct Material Involvement. Each Defendant was sufficiently and directly involved in the relevant facts, acts, and omissions alleged in this Complaint—including the design,

development, construction, ownership, financing, operation, management, maintenance, inspection, and leasing of the military housing at Camp Lejeune—such that each Defendant may be held jointly and severally liable for the resulting injuries and damages suffered by Plaintiffs.

81. Defendants are a leading provider of privatized military housing in the United States, managing and operating housing communities on multiple U.S. military installations through public-private partnerships with the Department of Defense.

82. For decades, Defendants and entities it controls have profited from a multi-billion-dollar corporate military housing monopoly that abuses, sickens, and traumatizes American military families. Pleas by these families to repair and remediate mold-infested homes have been met with inadequate maintenance practices and corporate indifference. This Complaint further details below the consequences of Defendants' leasing and management of military housing.

83. Defendants and their related entities consist of one of the largest construction multinationals in the world and one of the largest property management companies in the United States. The service-member families consist of service-members whose income is limited, as is their market power. Defendants have had since 2005 or earlier to cultivate relationships at MCB Camp Lejeune, while servicemember tenants are stationed there only temporarily, creating a vast power disparity in bargaining position and institutional knowledge.

84. Lend Lease is a multinational construction, property and infrastructure company. As of recent financial reports, it had a development pipeline approaching billions of dollars and

turned privatized military housing into a profit center by extracting maximum revenue while cutting service, repair, and maintenance costs.

85. Defendants have engaged in substantial and continuous business activities within the State of North Carolina, including but not limited to entering into contracts and leases to be performed in North Carolina, providing services to North Carolina residents and/or individuals residing with the state, or maintaining property or assets in North Carolina.

86. This Court has personal jurisdiction over Defendants pursuant to N.C. Gen. Stat. § 1-75.4 as the claims in this action arise out of Defendants' business transactions, in North Carolina.

87. Subject matter jurisdiction is conferred upon and vested in the Court pursuant to, and by virtue of, N.C. Gen. State §§ 7A-240 and 7A-243

88. Venue is proper in the Court, pursuant to N.C. Gen. State 1-81 as all of the action complained of, and giving rise to the claims for relief alleged herein, arose in Onslow County, North Carolina.

## FACTUAL ALLEGATIONS PERTINENT TO ALL COUNTS

### Background of the Military Housing Privatization Initiative ("MHPI")

89. Plaintiffs repeat and reallege each and every allegation of the foregoing Paragraphs as though fully set forth herein at length.

90. In 1996, in response to Department of Defense concerns about the effect of poor-quality housing on servicemember families, Congress enacted the Military Housing Privatization Initiative (the "Privatization Initiative" or "MHPI"), National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, §§ 2801-02, 110 Stat. 186 (1996), codified as

23

amended at 10 U.S.C. §§ 2871-85. The Privatization Initiative is a public/private program that, among other things, seeks "to stimulate private sector financing of military housing construction and revitalization projects," S. Rep. No. 104-112, §§ 2811 pp. 329 (1995), and "substantially upgrade military housing on an accelerated basis." The initiative recognizes that being a landlord is not a core competency of the military and that responsibility should be transferred to private-sector developers for construction, renovation, maintenance, and repair of housing.

91. Since 1996, private-sector developers and property management companies have assumed primary responsibility for the construction, renovation, maintenance, and repair of approximately 99 percent of domestic military family housing in the United States. Under the MHPI, the private company enters into a 50-year ground lease with the applicable department of the military. These ground leases share generic similarities. Under ground lease terms, the relevant branch of the military is not involved in the day-to-day operations pertaining to the construction or management of the housing units. The private entities— here, Defendants—are deemed the managing member; they promise to develop, construct, maintain, operate and manage the project to a high level of skill and care for the duration; they have exclusive management and control including all the rights and powers of a manager to do all things which are necessary, proper or desirable to carry out their duties and responsibilities; and they carry insurance and indemnify or hold harmless the military department for any claims arising out of the department's participation as a non-managing member.

92. Under the MHPI financial structure, service members are entitled to a Basic Allowance for Housing ("BAH"). Federal law provides that any member of a uniformed service who is

24

entitled to basic pay is also entitled to a basic allowance for housing. 37 U.S.C. § 403(a)(1). The BAH amount varies according to the service member's pay grade, dependency status, and geographic location and is set to reflect a rental amount that would obtain reasonable quality housing in the region. Private landlords participating in the MHPI, such as Defendants, collect rents equivalent to the BAH by obtaining automatic assignment of the BAH through the provisions of form lease agreements. Defendants treat the BAH as a guaranteed revenue stream. Under this arrangement, tenants do not have the ability to threaten to withhold some or all of the rental payment as a means of forcing the landlord to remedy poor conditions, as might be available in the civilian housing market. This power imbalance places servicemember tenants in a vulnerable position with limited market power compared to large multinational developers and property management companies.

93. Congress further enacted a Tenant Bill of Rights, codified at 10 U.S.C. § 2890, expressly conferring enforceable protections on military families residing in privatized housing. These include, but are not limited to:

    a. The right to reside in a housing unit and community that meets applicable health and environmental standards, § 2890(b)(1);

    b. The right to reside in a housing unit that has working fixtures, appliances, and utilities and to reside in a community with well-maintained common areas and amenity spaces, § 2890(b)(2);

    c. The right to a written lease with clearly defined rental terms, including all addenda and regulations imposed by the landlord regarding occupancy and use of common areas, § 2890(b)(4);

d.  The right to receive property management services provided by a landlord that meet or exceed industry standards, performed by trained, responsive, and courteous staff, § 2890(b)(9); and

e.  The right to expect uniform and transparent processes for maintenance and repair, to the maximum extent applicable without violating local, State, and Federal regulations, § 2890(b)(18).

94. The purpose of the MHPI was to allow the military services to focus on their core mission of national defense while delegating day-to-day housing operations to private entities. In doing so, Congress intended that private landlords such as Defendants would be subject to the same state and local landlord-tenant obligations that apply to all private housing providers. Defendants therefore cannot evade accountability by invoking federal enclave jurisdiction; the MHPI expressly contemplates continued compliance with state and local law and creates enforceable rights for tenants such as Plaintiffs. Defendants hold exclusive management and control over housing and do not enjoy governmental immunity for their private business operations.

### Systematic Problems Emerge Across MHPI Projects

95. Despite the promise of improved housing quality under privatization, systemic problems have emerged across MHPI projects nationwide. Over time, servicemember families began to connect with each other and work with elected representatives and nonprofit groups to expose unacceptable conditions at privatized military housing, including at MCB Camp Lejeune. As these problems were revealed, they led to public outcry, congressional hearings, and governmental watchdog investigations.

26

96. In October 2016, the Department of Defense Office of Inspector General ("OIG") issued a summary report analyzing previous health and safety inspections of DoD-occupied facilities and military housing.[1] The OIG findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative maintenance and inspections being performed at the installations. As a result, DoD personnel and military families were exposed to health and safety hazards at installations around the world."[2] The OIG summarized prior reports finding critical deficiencies including "safety problems, such as unmitigated mold growth in multiple buildings and family housing units."[3]

97. Congressional hearings in 2018, 2019, and 2020 revealed disturbing testimony from military families about mold exposure, pest infestations, water intrusion, ineffective maintenance, inadequate repairs, and dismissive customer service.

98. Representatives of privatized housing companies, including those associated with the Defendants' corporate affiliates, have admitted to "unacceptable" conditions and "living standards that were clearly unacceptable, and which required immediate attention."[4]

---

[1] Summary Report - Inspections of DoD Facilities and Military Housing and Audits of Base Operations and Support Services Contracts, Department of Defense Office of Inspector General, DODIG-2017-004, October 14, 2016. ("2016 OIG Report").

[2] Id.

[3] 2016 OIG Report, findings, p. 6. It noted that "[i]n addition to the critical mold-related deficiencies in Report No. DODIG-2014-121, we also documented mold-related problems in all three of the reports that included environmental health and safety inspections (Report Nos. DODIG-2015-013, DODIG-2015-162, and DODIG-2015-181)." Id. Of those reports, DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, surveyed three installations in the Southeastern region of the continental United States—Patrick Air Force Base (AFB), Naval Station (NS) Mayport, and Fort Gordon. DODIG-2015-162, Continental United States Military Housing Inspections – National Capital Region, surveyed two installations in the United States National Capital Region—Fort Belvoir and Joint Base Anacostia-Bolling.

[4] Statement for the Record, by Denis Hickey, Chief Executive Officer, Lendlease Americas Inc., to the House Appropriations Committee, Subcommittee on Military Construction, Veterans Affairs and Related Agencies, March 3, 2020, at p. 1: "This inquiry revealed certain living standards that were clearly unacceptable, and which require immediate attention. Over the past year, Lendlease has reflected deeply on its performance." Available at https://www.congress.gov/116/meeting/house/110611/witnesses/HHRG-116-AP18-Wstate-HickeyM-20200303.pdf.

27

99. Despite public admissions by Defendants' executives—including sworn commitments to remedy intolerable conditions—substantial corrective action failed to materialize, and the same unacceptable conditions persisted.

100. Reports by the Department of Defense Inspector General and the GAO repeatedly documented systemic failures, unmitigated mold growth, and environmental hazards across military housing, stemming from a lack of proper maintenance and oversight. Despite promises to implement meaningful reforms, Defendants have failed to improve conditions, instead relying on failed repair protocols and misleading customer analytics, leaving the systemic hazards unaddressed.

### Defendants' Systemic Profit-Driven Mismanagement at Camp Lejeune

101. The chronic and hazardous conditions experienced by military families at Camp Lejeune resulted from an overarching scheme by Defendants to prioritize profits over their contractual and moral obligations to provide safe, habitable housing. This pattern of conduct was marked by deliberate underfunding, manipulative reporting, and disregard for tenant well-being, all rooted in the pursuit of financial gain.

102. Defendants persistently neglected the construction, repair, and maintenance of military housing at Camp Lejeune to maximize profits. Rather than invest sufficiently in the upkeep and remediation of the properties, Defendants treated the residential communities as mere profit centers, showing little regard for the habitability of the homes provided to servicemember families. These decisions directly benefited their bottom line, exacerbating property deterioration and hardship for tenants.

103. In particular, Defendants reduced repair and maintenance expenditures not only to elevate profits but also to satisfy stringent financial obligations to investors and lenders,

28

including fluctuating interest and BAH (Basic Allowance for Housing) metrics that put additional fiscal pressure on them to cut corners.

104.     To secure financing in 2004-05, Defendants made ambitious profit projections to private investors, pledging outsized returns that could only be achieved by cutting essential services. Unlike non-military housing, where tenant satisfaction influenced business, Defendants exploited their unique authority over a "captive" military tenant population, enabling them to underfund service, maintenance, and repairs to unprecedented levels.

105.     Internal documents and investor presentations revealed the profit-driven logic: for each BAH rental payment received, less would be spent on maintenance ($131) than the profit distributed to investors ($148) – even after debt repayment. [5] Investor communications likewise projected enticing returns of 10% to 25% after expenses, and the financial arrangements entered in 2005-06 locked Defendants into high interest rates, increasing pressure to convert cost savings into profit.

106.     Through this cost-cutting regime, Lend Lease nearly doubled the valuation of its privatized military housing projects, evidenced by annual report highlights describing "substantial uplift in…equity investment" and escalating management fees.[6] The striking contrast between soaring profits and tenant suffering underscores the unreasonableness and recklessness of Defendants' conduct.

107.     Over the relevant time, pursuant to uniform company policies, Defendants routinely breached their commitments to maintain and repair Camp Lejeune homes.

---

[5] Lend Lease Investor Tour, slide presentation, July 16, 2004, available at http://media.corporate-ir.net/media_files/IROL/18/186950/actuslendlease_FINALv3.pdf ("2004 slides"), slide 24.
[6] 2018 annual report, p. 170; 2019 annual report, p. 160; Michael West, Abracadabra: Lendlease magic tricks come home to roost, March 15, 2019, available at https://www.michaelwest.com.au/abracadabra-lendlease-magic-tricks-come-home-to-roost/.

108.    Defendants paid repair and maintenance employees inadequate wages and provided little training. Maintenance technicians and change-of-occupancy workers were given only basic checklists to follow and lacked special training in mold detection, assessment, or remediation. Much of the management was performed remotely by managers at distant offices, preventing adequate oversight of work quality.

109.    Defendants had a financial incentive to direct work orders to their own poorly trained employees rather than pay outside vendors with specialized mold assessment skills and tools. This practice saved money for Defendants while exposing military families to dangerous conditions.

110.    Under Defendants' operational rules, employees were required to maintain productivity goals of ten or more service visits per technician per day, making it virtually impossible to give families complaining of water intrusion, mold, HVAC, or other problems anything more than superficial "band-aid" attention. These productivity metrics prioritized speed over quality and ensured that root causes of problems were never addressed.

111.    Defendants paid bonuses based on metrics such as resident satisfaction survey ratings (which were biased and unreliable) rather than on actual quality of repairs or housing conditions, creating perverse incentives that rewarded manipulation of data rather than solving problems.

112.    While fully aware of the pervasive issues—including mold growth, water intrusion, and failing systems—Defendants continued to lease these homes, frequently misrepresenting their habitability and the adequacy of past and future maintenance.

30

113.     Defendants further sought to conceal the scope of the crisis through distorted survey data and unreliable recordkeeping.

114.     Defendants promoted exaggerated resident satisfaction rates, a fact confirmed by the GAO's 2019 findings and a 2019 nonprofit survey actually showing overwhelmingly negative experiences among tenants.[7] These skewed metrics were used both to appease government overseers and to secure performance bonuses.

115.     Maintenance records were deliberately maintained in a manner so unreliable they could not withstand audit scrutiny.

116.     Defendants' repair and maintenance personnel falsify time sheets, claiming to have completed work that was never performed, and "sandbagging" repair tickets.

117.     When managers attempted to discipline workers for such conduct, regional management rescinded the discipline, demonstrating systematic tolerance of fraudulent practices.

118.     These improper practices inflate work performed and enhance revenue, at tenants' expense.

---

[7] The data showed that 190 respondents at Lejeune reported a negative experience with the Defendants, while only 46 reported a positive experience. *See* M.B. Pell and Joshua Schneyer, Survey shows U.S. military families far more negative about housing than landlords claim, Reuters, May 22, 2019, available at https://www.reuters.com/investigates/special-report/usa-housing-map/. See also MFAN 2019, available at https://militaryfamilyadvisorynetwork.org/wp-content/uploads/FINAL-report-5.20-_FOR-RELEASE_5_22.pdf.; Military Family Advisory Network ("MFAN"), Final Research Report: Living Conditions of Families in Privatized Military Housing, May 2019 ("MFAN 2019") at pp. 10 (survey took place in early 2019), 15 (21.07% had very negative satisfaction rate, 39.46% had negative for total of 60.53%), 156 (showing Lejeune survey results by issues and manifest effects: Maintenance, repairs, or remediation, 65%; Mold, 38%; Weather damage, 33%; Structural concerns, 23%; Filth in homes, 20%).

119.    These problems echoed broader company practices involving fraudulent overbilling and labor misreporting, as evidenced by prior government actions and settlements involving Lend Lease and its affiliates.[8]

120.    Defendants incentivized poor performance through biased bonus programs and undertrained, underpaid maintenance staff—choosing company employees with inadequate mold assessment training overqualified external vendors, all to reduce costs further.

### Defendants' Lease Agreement

121.    At all relevant times, Defendants' utilized a written MHPI Military Member Tenant Universal Lease Agreement. The Leases identify Atlantic Marine Corps Communities LLC, as the owner/landlord of the Premises, and AMCC Property Management LLC as the property manager/agent and incorporates the Community Guidelines & Policies (Resident Guide) and Community-Specific Addendum (together with related Schedules and Addenda, the "Universal Lease").

122.    Under the Universal Lease, the owner is responsible for maintenance and repair and for providing safe, sanitary, habitable housing. The Universal Lease further provides that it is governed by the laws of the State in which the premises are located, and that North Carolina landlord–tenant law—and North Carolina common law interpreting it—shall apply. Tenants are prohibited from undertaking most repairs or alterations without written consent, leaving control of safety and habitability with Defendants.

---

[8] U.S. Attorney's Office, E.D.N.Y., press release, Construction Giant Lend Lease (F/K/A Bovis) Charged with Defrauding Clients in Three Separate Schemes – Will Pay over $50 Million and Institute Comprehensive Reforms, April 18, 2012, https://www.justice.gov/archive/usao/nye/pr/2012/2012apr24.html.

123.     The Community Guidelines, incorporated into the Universal Lease, establish maintenance response standards and escalation procedures and classify water intrusion and visible mold as urgent conditions requiring immediate remediation. They also direct tenants to route habitability and safety issues through Defendants' maintenance system, reinforcing Defendants' day-to-day control over hazard identification and correction.

124.     The Community-Specific Addendum and related addenda adopt and reference North Carolina statutory and local requirements, including the landlord tenant relations, habitability, damages, eviction, abandonment, and insurance. These provisions recognize that North Carolina law governs the tenancy and imposes state-law disclosure and oversight obligations on Defendants.

125.     Collectively, the Universal Lease Packet memorializes Defendants' voluntary submission to North Carolina legal standards and their contractual commitment to provide and maintain habitable housing and to treat water intrusion and mold as urgent maintenance issues.

126.     Defendants marketed and leased the homes as safe, well-maintained housing compliant with these obligations. The servicemember families were effectively captive to the lease over its duration because: (a) servicemembers forfeit their entire BAH upon acceptance of housing and cannot negotiate the price; (b) servicemembers cannot withhold rent to force repairs as civilian tenants can; (c) the Form Lease prohibits residents from taking many self-help measures, including making repairs, alterations, or improvements without written consent; (d) the lease prohibits residents from deducting repair costs from rent; and (e) servicemembers face significant barriers to breaking the lease and relocating

33

due to limited alternatives at military installations and potential impact on their military careers.

127.     By assuming these contractual duties, incorporating North Carolina statutes and standards into the tenancy documents, and voluntarily submitting to North Carolina law, Defendants undertook obligations enforceable irrespective of federal enclave status. These contractual and common-law duties form the basis of Plaintiffs' claims.

### Applicability of State Law Despite Federal Enclave Doctrine

128.     Plaintiffs' claims arise under longstanding North Carolina common law, including breach of contract, breach of implied warranty of habitability, negligence, gross negligence, fraud, negligent misrepresentation, breach of covenant of quiet enjoyment, unjust enrichment, and nuisance, which existed prior to 1941 and therefore remain enforceable at Camp Lejeune regardless of enclave status.

129.     In addition, Defendants expressly incorporated North Carolina landlord–tenant statutes and protections into their agreements with Plaintiffs. The Lease, Community Specific Addendum, and Community Guidelines adopt and reference the North Carolina Residential Rental Agreements Act (N.C. Gen. Stat. 42-38, et seq.), and related provisions of state law, demonstrating Defendants' contractual submission to North Carolina law.

130.     Defendants marketed, leased, and managed privatized military housing at Camp Lejeune as part of their commercial enterprise. In doing so, they engaged in consumer-oriented transactions with Plaintiffs, representing that the housing was safe, habitable, and maintained in compliance with applicable standards. These activities constitute consumer transactions within the meaning of the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1. The Lease Agreement and Community

34

Guidelines expressly incorporate North Carolina statutes, and Defendants voluntarily availed themselves of North Carolina's consumer marketplace. Defendants' misrepresentations, omissions, and unconscionable practices therefore fall squarely within the protections of the UDTPA, and Defendants cannot avoid accountability by invoking the federal enclave doctrine.

131.     Congress, through the Military Housing Privatization Initiative ("MHPI"), intended that private entities like Defendants would assume day-to-day responsibility for military housing while remaining subject to ordinary state landlord–tenant and consumer protection laws. The MHPI's Tenant Bill of Rights, 10 U.S.C. § 2890, expressly guarantees military tenants the right to safe, habitable housing, written leases, and property management services that meet health, environmental, and industry standards.

132.     By entering into the Lease Agreement and related agreements, Defendants voluntarily subjected themselves to North Carolina landlord–tenant and consumer protection laws. Plaintiffs' claims therefore rest on duties Defendants both assumed by contract and that exist independently under North Carolina law.

133.     Plaintiffs' claims do not seek to enforce any post-1941 state statute as free-standing law within the enclave. Rather, they enforce pre-existing North Carolina common-law duties—negligence, fraud, habitability, and related consumer-protection principles—and Defendants' voluntary contractual obligations incorporating North Carolina standards. To the extent Plaintiffs also plead a claim under the North Carolina UDTPA, that claim arises from Defendants' consumer transactions in North Carolina and from their contractual submission to North Carolina law, not from any attempt to regulate the federal government.

35

134.     Plaintiffs' claims do not regulate the federal government or interfere with military operations. Rather, they seek to enforce private landlord and property manager obligations undertaken by Defendants in their commercial enterprise of leasing housing to military families.

### Mold Is a Serious Health Hazard Requiring Prompt Removal and Control

135.     Exposure to mold can lead to significant health problems, including allergic reactions, respiratory issues, asthma attacks, and other chronic symptoms, especially for vulnerable individuals such as children, the elderly, or those with weakened immune systems. Prompt removal and moisture control are essential to protect occupants from the dangers associated with indoor mold infestation.

136.     The U.S. Centers for Disease Control and Prevention (CDC), the Institute of Medicine of the U.S. National Academy of Sciences, the American Academy of Allergy, Asthma & Immunology (AAAAI), and the World Health Organization (WHO) all agree that living or working in a building with mold-damaged building materials increases health risks to its occupants.

137.     The National Institutes of Health point to cognitive issues from extended exposure to mold including short-term memory loss, lightheadedness, dizziness, blurred vision, and loss of other cognitive functions. "Studies have also shown an association between prolonged mold exposure and increased levels of depression, anxiety, and stress in both children and adults."

138.     Mold is a fungus that reproduces by creating spores or microscopic cells. The spores and cells generate in large numbers and in chains that easily disperse into the air. Mold spores are generally invisible to the human eye. If adequate moisture is present when a

36

mold spore lands on a suitable carbon-containing food source, such as the paper on drywall, furniture, clothing, and furnishings, it begins to grow. Mold can grow with liquid water and even simply due to the presence of high relative humidity in the air.

139.     When certain species of mold grow and process nutrients, they produce chemicals called mycotoxins and excretory chemicals. Mycotoxins are known to be used as chemicals in biological warfare. These microscopic microbes and their chemistries can be toxic to human cells and to cause immune and other organ inflammation, injury, and disease. Mycotoxins attack the nervous, respiratory, immune, and muscular systems and can enter the body either via ingestion, inhalation or direct skin contact and can lodge in the digestive tract, lungs, or brain.

140.     Several mold genera, including Penicillium, Aspergillus, Cladosporium, and Stachybotrys, produce a wide variety of mycotoxins that are toxic to nearly all individuals who are exposed to them. Apart from being toxic, exposures to the microbes and chemistries are known to cause inflammation and immune system injury or dysfunction. Often, due to the latency periods between exposure and disease, one may be harmfully exposed and contacted, but the symptoms and disease may not be apparent for years. Medical monitoring is essential to deal with the effects of the chemical and microbial assault.

141.     Initial symptoms of mold and microbe exposure can include upper respiratory infections, coughs, sore throats, headaches, nausea, fibromyalgia, fatigue, hemorrhaging, convulsions, skin irritation, cancer, and organ and tissue damage including liver, kidney, neurological and immunologic disease.

37

142. For all these reasons, moisture, water damage, and mold must be immediately and properly remediated. For mold, at a minimum, proper remediation requires the removal of the water damage and mold source. In general, the process includes (i) identification of the mold source; (ii) containment of the affected area; (iii) removal of the mold and contaminated materials under containment; (iii) cleaning the contaminated area; and (iv) clearance testing.

143. When Defendants contracted to manage privatized military housing at Marine Corps Base Camp Lejeune, they were fully aware of the Base's geographic and climatic realities. Camp Lejeune sits in a warm, humid coastal region of North Carolina, characterized by low-lying terrain near the Atlantic Ocean and its tidal inlets. The area experiences frequent severe weather events, including tropical storms and hurricanes, creating inherent and foreseeable risks of water intrusion and mold proliferation. Despite this knowledge of the high-risk environmental conditions, Defendants failed to implement construction standards, maintenance protocols, or inspection procedures adequate to prevent water intrusion and mold growth. This failure was not inadvertent but rather a calculated choice driven by cost-cutting measures designed to maximize profits at the expense of the health and safety of military families entrusted to their care.

144. In recognition of the significant issues with mold at MCB Camp Lejeune, Defendants inserted a Mold Addendum into their lease documents. While much of it attempts to shift responsibility to tenants, the Mold Addendum nonetheless requires that Management respond in accordance with state law and the Lease to repair or remedy mold problems. Defendants systematically breached these specific contractual obligations to address mold in accordance with state law.

38

145. Military families need and deserve safe and healthy homes at their assigned installations to sustain military and family readiness, recruitment, and retention. Servicemember families reasonably expect housing that is safe, habitable, and properly maintained. Many military families are young families with infants or young children who are particularly vulnerable to mold exposure and environmental hazards. The service-member parent is often deployed for extended periods, far away from home, or busy with demanding assignments on-base, leaving spouses to deal with housing problems alone. When spouses reported problems during deployments, Defendants' representatives frequently treated them dismissively, stopped work, and ceased communications, exploiting the servicemember's absence. Due to these circumstances and vulnerabilities, it is critically important that service member families receive safe housing and effective property management services.

146. The specific experiences of Plaintiffs in this action reflect the systemic failures in the privatized military housing model when profit motives are prioritized over the health, safety, and welfare of servicemember families and their children.

## Defendants' Lease of Military Housing to Plaintiffs at Camp Lejeune

147. Plaintiffs rented homes at Camp Lejeune owned and/or managed by Defendants under Defendants' written MHPI Military member Tenant Lease Agreement incorporating North Carolina landlord-tenant law.

148. The Lease Agreements promise that the homes would be delivered to Plaintiffs in a safe, clean and habitable condition.

39

149. The Lease Agreements promise that: "Owner is responsible for maintenance and repair of the [home] in accordance with applicable law (including, but not limited to, any safety and habitability requirements), . . ."

150. The Lease Agreements identify Defendants as the exclusive point of contact for leasing, repairs, habitability, and safety concerns, requiring all maintenance complaints to be submitted through their work order system and directing tenants to rely on Defendants' representations regarding the condition of their homes.

151. The Lease Agreements promise that: "Owner will respond [to all reports of water and/or mold] in accordance with local, federal and state guidelines to repair or remedy . . ."

152. The Lease Agreements promise that if the homes become uninhabitable, "then Owner will relocate [Plaintiffs] either temporarily or permanently at no cost to [Plaintiffs]."

153. The Lease Agreements promise that Plaintiffs were entitled to peacefully enjoy the use homes.

154. The homes leased to Plaintiffs were infested with toxic mold due to water intrusion, maintenance failures and pervasive neglect by Defendants.

155. Plaintiffs repeatedly notified Defendants of mold, severe water damage and uninhabitable conditions immediately.

156. Defendants failed and refused to properly remediate mold, provide safe living conditions, or make required repairs.

157. Defendants actively concealed known mold conditions, provided false and misleading information about property safety, and performed sham or inadequate repairs.

40

158.    Plaintiffs **Anthony Barbaglia, Tarajon Barbaglia, and their minor children** rented a home from Defendants in Camp Lejeune beginning in January 2024.

159.    Sergeant Anthony Barbaglia and his family were previously stationed at Camp Lejeune from 2016 to 2020. During that tour, the family watched the Knox Landing neighborhood being constructed and specifically desired to live there due to its advertised status as the newest neighborhood on Camp Lejeune, its prime location for convenient base access, and the promise of newer homes with superior quality compared to older base housing.

160.    After a three-year assignment in Okinawa, Japan, the Barbaglia family returned to Camp Lejeune in July 2023. Despite their rank and housing eligibility, no housing was available on base. The family was forced to rent off-base housing in town and wait 14 months for an on-base home to become available. Throughout this waiting period, the Barbaglias specifically requested housing in Knox Landing—the neighborhood they had seen being built and believed would provide the highest quality, newest construction available.

161.    In January 2024, Defendants finally offered the Barbaglia family a home in Knox Landing at their desired location.

162.    Shortly after moving in, Tarajon Barbaglia discovered she was pregnant.

163.    At the time Plaintiffs Barbaglia moved into the property, Defendants represented that the home was safe, clean, and habitable. Defendants failed to disclose the history of mold problems, water intrusion issues, or prior tenant complaints regarding the property.

164.    In April 2024, Plaintiffs noticed condensation the window blinds, followed by condensation on the air register in the laundry room.

41

165.    Plaintiffs repeatedly reported the mold and moisture problems to Defendants through their maintenance request system.

166.    Despite repeated requests, Defendants failed to:

    a.  Conduct proper mold testing or assessment by qualified professionals;

    b.  Remove mold-contaminated building materials;

    c.  Address the underlying moisture and ventilation problems causing mold growth;

    d.  Relocate the family during remediation;

    e.  Provide temporary housing; or

    f.  Take any action adequate to render the home safe and habitable.

167.    By July 2024, Plaintiffs discovered a pool of water in the dryer. Again, Defendants dismissed complaints and did nothing.

168.    Thereafter, Plaintiffs reported that they suspected mold in the home. An inspection of the home was scheduled with the environmental team.

169.    During the environmental team's walkthrough, workers opened up a space in the laundry room that provided access to the intermediate space between the first and second stories of the attached town home. As soon as they opened that box, everybody present—including Plaintiffs and Defendants' environmental team—got hit with this chest-burning acidic smell that was undeniable.

170.    Thereafter, mold grew throughout the home exponentially and in August 2024, Defendants displaced Plaintiffs to a hotel temporarily.

171.    Due to the overwhelming amount of mold in the home, Defendants offered Plaintiffs a different home in a different neighborhood. Plaintiffs went to inspect the home before moving in and discovered it was also covered in mold so Plaintiffs never moved in.

42

172.     Defendants offered a third home that Defendants had explicitly represented had just been fully gutted, renovated, and was the safest possible housing for a family expecting a baby.

173.     Plaintiffs moved into the new home on September 11, 2024. Within 4 to 5 days of moving in, Plaintiffs discovered condensation in the vents in the laundry room and mold growing behind the HVAC unit.

174.     Plaintiffs reported the mold but Defendants yet again failed to properly remediate the mold.

175.     On September 17, 2024, Ms. Barbaglia was induced due to significantly high blood pressure and on September 18, 2024, Barbaglia's baby was born with spina bifida.

176.     While the family was at the hospital for the emergency delivery, Defendants made superficial repairs and told the Barbaglias that everything was fine, even though Defendants had not in fact properly remediated the mold.

177.     Thereafter, the Barbaglias repeatedly discovered condensation and new mold. The Bargalias reported the conditions to Defendants and Defendants failed to properly resolve the issues.

178.     The Barbaglias were finally able to leave the moldy homes at Camp Lejeune when they relocated to another military base.

179.     The Barbaglia family was displaced to and occupied two separate houses and inspected a third, all of which were contaminated with mold. This pattern across three different houses proves the problems are not isolated incidents but rather systemic construction defects, inadequate maintenance protocols, and failure to properly remediate

43

affecting the entire Knox Landing development and potentially all of Defendants' Camp Lejeune housing stock.

180.     As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

181.     Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

182.     Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

183.     As a result of prolonged exposure to mold and related conditions, Plaintiffs Barbaglia family members suffered physical and personal injury including respiratory issues.

184.     Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

185.     Plaintiffs **Nicholas Bower, Brittany Bower, and their minor children** rented a home from Defendants in Camp Lejeune in November 2023.

186.     At the time Plaintiffs Bower moved into the property in November 2023, Defendants represented through marketing materials, lease documents, website content, and direct statements by Defendants' agents that the home was safe, clean, habitable, properly maintained, and suitable for a military family with young children. Defendants failed to disclose any history of construction defects, mold problems, water intrusion issues, systemic HVAC failures, or complaints from prior tenants regarding the Knox Landing development or the specific unit.

44

187. In approximately June 2024—approximately seven months after move-in—Plaintiffs first noticed condensation dripping from air vents in the laundry room.

188. Plaintiffs promptly called Defendants' maintenance line to report the condensation issue.

189. By July 2024, the whole back door was covered in mold and the laundry room vent that had first shown condensation was now dripping water continuously onto the floor.

190. Throughout July 2024, Defendants' representatives attributed all problems to the humidity and weather conditions rather than acknowledging construction defects or HVAC failures. This misrepresentation prevented Plaintiffs from understanding the true nature of the systemic defects.

191. At the end of August 2024, after weeks of inadequate responses from Defendants, Plaintiffs hired an independent mold testing professional to conduct proper assessment of their home, which revealed high levels of mold spores in the downstairs area alone. When Plaintiffs presented these test results to Defendants, they disregarded the results and continued to minimize the problems.

192. Mold and moisture problems continued and Plaintiffs reported the problems to Defendants through their maintenance request system.

193. Despite repeated requests, Defendants failed to:

    a. Conduct proper mold testing or assessment by qualified professionals;

    b. Remove mold-contaminated building materials;

    c. Address the underlying moisture and ventilation problems causing mold growth;

    d. Relocate the family during remediation;

    e. Provide temporary housing; or

45

f. Take any action adequate to render the home safe and habitable.

194. After repeated inadequate responses from Defendants, Plaintiffs were temporarily relocated to a hotel from August 2024 through October 2024.

195. During the relocation period, Defendants represented that they were remediating the mold problems and making the home habitable.

196. In mid-October 2024, Plaintiffs returned to the home after two months of displacement.

197. Immediately upon return, while moving furniture and cleaning, Plaintiffs discovered new mold growing from their daughter's bedroom closet floorboards. When they investigated further and pulled up the carpet, they found that the flooring was covered in mold.

198. Plaintiffs continue to discover mold in the home and continue to report the conditions to Defendants. Defendants continue to fail to completely remediate the mold.

199. As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

200. Throughout their tenancy, Plaintiffs have paid and continue to pay their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

201. Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

202.     As a result of prolonged exposure to mold and related conditions, Plaintiffs Bower family members all suffered physical and personal injury including severe respiratory issues including difficulty breathing and constant runny noses.

203.     Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

204.     Plaintiffs **Kevin and Bianca Cassara and their minor children** rented a home from Defendants in Camp Lejeune in August 2023.

205.     At the time Plaintiffs Cassara moved into the property, Defendants represented that the home was safe, clean, and habitable. Defendants failed to disclose the history of mold problems, water intrusion issues, or prior tenant complaints regarding the property.

206.     As Plaintiffs moved in, they observed multiple concerning conditions including visible mold in the home, a strong musty smell throughout the home, high humidity, and ductwork still being installed as Plaintiffs were moving in.

207.     Maintenance personnel came and cleaned the visible mold with surface wiping. At that time, Plaintiffs reasonably believed the mold had been removed and that the problem was resolved. Plaintiffs had no knowledge of mold remediation protocols and no reason to suspect that proper mold removal requires assessment, containment, removal of contaminated materials, source correction, and clearance testing rather than simple surface cleaning.

208.     Within approximately two to three weeks of move-in—in September 2023—the mold recurred, demonstrating that the initial cleaning had been wholly inadequate. Specifically, the ductwork that had been installed during move-in failed, the ceiling became

wet from the ductwork failure and mold was discovered in the bathroom vanity—the same area where mold had been visible before.

209. Plaintiffs were displaced for approximately two days while Defendants' workers ripped out the wet ceiling, replaced the failed ductwork, and removed and replaced the bathroom vanity. At the time of this September 2023 remediation, Plaintiffs were satisfied that Defendants were taking care of the problem and believed upon return that all mold issues had been resolved. Defendants made no disclosures suggesting systemic construction defects, and Plaintiffs had no reason to suspect the problem would continue.

210. In approximately July or August 2024, Plaintiffs discovered that mold had reappeared throughout the home—the first-time visible mold had returned since the September 2023 remediation.

211. Thereafter, Plaintiffs were displaced from their home during Defendants' remediation attempts.

212. Throughout all of this same time, the Cassaras were all chronically ill. In August of 2024, a doctor informed the Cassaras that the bacterial infection in of their minor children had been suffering from was being caused by mold in the home. The Cassaras underwent testing that showed high levels of mold in all family members.

213. Thereafter, Plaintiffs were against displaced from their home during Defendants' remediation attempts.

214. As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

48

215.    Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

216.    Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

217.    As a result of prolonged exposure to mold and related conditions, Plaintiffs Cassara family members suffered physical and personal injury.

218.    Plaintiffs Kevin and Bianca Cassara have suffered cognitive symptoms including irritability, forgetfulness and brain fog resulting from mold contamination.

219.    Minor Plaintiff B.C.'s previously well-controlled asthma became severely uncontrolled upon moving into the home requiring daily use of Albuterol inhaler and nebulizer treatments, daily inhaled corticosteroid, multiple daily allergy controller medications, treatment for upper respiratory viruses and chronic strep throat with the infection recurring within a month of antibiotic treatment. B.C. also suffered cognitive and behavioral symptoms while living in the home. These cognitive and behavioral symptoms, combined with recurring strep throat infections that failed to fully resolve with antibiotics, are hallmark indicators of PANDAS, a serious neuropsychiatric condition triggered by streptococcal infections and associated with mold exposure.

220.    Minor Plaintiff H.C. symptoms include chronic eczema covering his entire body systemic inflammatory skin reaction consistent with immune response to mold exposure in young children, respiratory issues including chronic coughing, congestion, and runny nose, and severe behavioral dysregulation and aggression. These symptoms are ongoing and permanent as a result of the neurological harm caused by early childhood mold exposure.

221.    Minor Plaintiff B.C.'s symptoms including eczema, an immune / inflammatory response to mold and respiratory issues including coughing, congestion and runny nose.

222.

223.    Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

224.    Plaintiffs **Ethan Doute, Michelle Doute, and their minor children** moved to Camp Lejeune in January 2024.

225.    At the time Plaintiffs Doute moved into the property, Defendants represented through marketing materials, lease documents, and direct statements by Defendants' agents that the home was brand new, safe, clean, and habitable. Defendants failed to disclose any history of construction defects, moisture intrusion issues, inadequate sealing, HVAC system deficiencies, or firewall failures in the Knox Landing development. Plaintiffs' initial impression of the home was highly favorable—approximately 8 out of 10—as they were excited to move into what they believed was quality new construction specifically designed for military families.

226.    Upon moving in, Plaintiffs noticed condensation on windows, musty odors, and visible mold growth in various places in the home.

227.    Plaintiffs repeatedly reported the mold and moisture problems to Defendants through their maintenance request system.

228.    Despite repeated requests, Defendants failed to:

    a.  Conduct proper mold testing or assessment by qualified professionals;

    b.  Remove mold-contaminated building materials;

    c.  Address the underlying moisture and ventilation problems causing mold growth;

50

    d. Relocate the family during remediation;

    e. Provide temporary housing; or

    f. Take any action adequate to render the home safe and habitable.

229. After repeated inadequate responses from Defendants, Plaintiffs were temporarily relocated.

230. During the relocation period, Defendants represented that they were remediating the mold problems and making the home habitable.

231. Upon return to the home, Plaintiffs discovered that the mold problems persisted.

232. As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

233. Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

234. Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

235. As a result of prolonged exposure to mold and related conditions, Plaintiffs Doute family members suffered physical and personal injury including respiratory issues.

236. Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

237. Plaintiffs **Michael Hinrichs, Kim Hinrichs, and their minor children** rented a home from Defendants in August 2023.

238. The Hinrichs family had been a military family for approximately twelve years by the time they returned to Camp Lejeune. Sergeant Hinrichs and his family were previously

stationed at Camp Lejeune in 2013 and watched the Knox Landing neighborhood and Wilson gate area being constructed. The family specifically requested housing in this development when they returned, believing it would provide quality, newer construction.

239.    After a tour at Camp Pendleton, California, the Hinrichs family returned to Camp Lejeune and was placed on a housing waitlist for "a little over a year." When they finally arrived at Camp Lejeune, they lived in a hotel for a month and a half while waiting for housing to become available in their requested Knox Landing neighborhood.

240.    In August 2023, Defendants assigned the Hinrichs family a three-bedroom, 2.5-bathroom, two-story home in Knox Landing.

241.    Within the first two to three months of occupancy in approximately October-November 2023, Plaintiff Kim Hinrichs noticed rust starting to appear on A/C vents and experienced condensation and what appeared to be rain collecting inside the dryer. She notified maintenance about the dryer issue. Maintenance workers came, cleaned the vents, and told her it was probably just her dryer —attributing the problem to her appliance rather than the building's construction defects.

242.    In approximately June or July 2024, Plaintiff Kim Hinrichs went out to change the monthly air filter in the HVAC system, which is housed in an outdoor closet. She typically performed this maintenance task at night because it was cooler. On this occasion, she had trouble with the filter and asked Sergeant Hinrichs to help. He showed her that there was a light inside the closet—something she had not known during the near year of monthly filter changes in the dark.

243.    When they turned on the light, they discovered that 3 out of the 4 walls in this little closet were completely covered in black. The next morning, Plaintiff Kim Hinrichs called

maintenance and told them she found mold. Defendants told her it was not mold and was instead just "environmental growth."

244.    Maintenance workers came to the home and cleaned the area they could reach and painted over the walls.

245.    In July or August 2024, the Hinrichs discovered mold growing in the corner of one of the bedrooms all the way up the walls from the carpet. Plaintiffs informed Defendants of the mold on the walls.

246.    By September 2024, the mold problem had become overwhelming and undeniable. There was mold on every A/C vent throughout the house. There was mold growth above the dryer vent and visible in nearly every doorway.

247.    Plaintiffs repeatedly called Defendants requesting remediation of the mold. Defendants repeatedly said they would send someone to take care of it but they never did.

248.    After repeated calls and visits to the office in person, Defendants finally displaced the Hinrichs to an off-base hotel.

249.    While staying in the hotel, the Hinrichs learned that Defendants were not going to even begin to remediate the mold in the home until December 2024 at the earliest. Accordingly, in October 2024, the Hinrichs family broke their lease and moved out.

250.    As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property, including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

251.    Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

53

252. Plaintiffs incurred out-of-pocket expenses, including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

253. As a result of prolonged exposure to mold and related conditions, Plaintiffs Hinrich's family members suffered physical and personal injury, including congestion, sinus issues, and respiratory issues. Minor child D.H. contracted strep throat and required hospitalization and antibiotic treatment—a significant risk factor for PANDAS (Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections).

254. Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

255. Plaintiffs **Scott Kea, Shelby Kea, and their minor children** rented a newly constructed home from Defendants in August 2020. Sergeant Kea and his family had previously been stationed at Camp Lejeune from 2013 to 2015 and watched the Knox Landing community being built during that time. The family specifically requested housing in this community upon their return to Camp Lejeune because of its proximity to New River Air Station where Sergeant Kea was assigned and because they believed the newly constructed homes would be of high quality and free from the problems associated with older military housing.

256. At the time Plaintiffs Kea moved into the property, Defendants represented through marketing materials, lease documents, and direct statements by Defendants' agents that the home was brand new, safe, clean, and habitable. Defendants failed to disclose any history of construction defects, moisture intrusion issues, inadequate sealing, HVAC system deficiencies, or firewall failures in the Knox Landing development. Plaintiffs' initial impression of the home was highly favorable—approximately 8 out of 10—as they were

54

excited to move into what they believed was quality new construction specifically designed for military families.

257.     In approximately December 2020, approximately four months after move-in, Plaintiff Shelby Kea discovered the first visible mold on the ceiling of the children's bathroom. At that time, the Keas did not know and could not have reasonably known the nature, extent, or cause of what would become pervasive mold contamination throughout the home. The Keas promptly called Defendants' maintenance line, and a maintenance technician responded the next day. The technician performed only superficial cleaning—wiping the visible mold with a solution and rag—without conducting any testing, removing contaminated materials, or investigating the underlying moisture source. At the time, Plaintiffs were satisfied with this response, reasonably believing Defendants had resolved the problem.

258.     However, the mold recurred. Throughout the summer of 2021, while Sergeant Kea was deployed, Plaintiffs experienced multiple additional incidents of mold growth in the bathrooms—both the children's bathroom and the master bathroom. During the first year of tenancy, the mold appeared to be contained to bathroom areas. Each time, Defendants' maintenance personnel responded with the same superficial cleaning approach, never conducting proper mold assessment, never removing contaminated building materials, and never addressing underlying moisture intrusion or ventilation deficiencies.

259.     Beginning in January or February 2022—approximately 17-18 months after move-in—the mold problem escalated dramatically and became pervasive. From that point forward, the Kea home experienced mold growth every single month in a revolving door of recurring contamination that continued until the family finally moved out in April 2025.

55

The mold was no longer confined to bathrooms but spread throughout the home, including condensation leaking from air vents in the laundry room and downstairs half bathroom, mold growth under windowsills in both children's bedrooms, mold in the kitchen, mold around every electrical outlet on exterior walls and mold on all sprinkler heads throughout the home.

260.     The severity of the mold contamination rendered critical areas of the home unusable. Plaintiffs lost the use of their kitchen and laundry room due to pervasive mold, forcing the family to live without these essential facilities for extended periods.

261.     Throughout this period, Defendants made repeated trial-and-error repair attempts, none of which addressed the root causes of the mold. Each time, Defendants represented that the problem was solved, and each time, the mold returned within weeks or months.

262.     The full nature and extent of the systemic construction defects causing the mold were concealed from Plaintiffs and were not and could not have been discovered through reasonable diligence until professional testing was finally conducted in 2023 and 2024, which revealed widespread construction defects that explained the persistent moisture intrusion, condensation, and mold growth that no amount of surface cleaning could resolve. Plaintiffs could not have discovered these concealed construction defects without professional testing, which Defendants resisted and delayed for years while continuing to collect full BAH rental payments and assuring Plaintiffs that problems were being resolved.

263.     Throughout the tenancy, Defendants repeatedly minimized, dismissed, and misrepresented the mold problems, attributing them to the humid North Carolina climate, weather conditions, or tenant behavior rather than acknowledging systemic construction

defects. Defendants' agents told Plaintiffs that pervasive mold was normal and expected North Carolina.

264.     Defendants repeatedly provided false assurances that problems had been resolved after each superficial repair attempt. After sealing boots, HVAC components, windowsills, door frames, and electrical outlets, Defendants consistently told Plaintiffs that the mold would not return, that the home was now safe, and that the family could continue living there without concern. These representations were false, as Defendants knew or should have known that surface-level repairs could not address the underlying construction defects causing moisture intrusion.

265.     In the summer of 2023, after years of persistent complaints and worsening conditions, Defendants temporarily displaced the Kea family to a hotel for two weeks. During this displacement, Defendants represented that they were remediating the mold problems and making the home habitable. Upon return, the mold problems persisted, demonstrating that Defendants had not conducted proper remediation.

266.     Throughout the tenancy, all members of the Kea family suffered serious and progressive health consequences from prolonged mold exposure.

267.     Throughout the four years living in this home, Sergeant Kea has experienced the worst and most frequent illnesses of his adult life, including persistent head colds, congestion, and ear pain—symptoms he never experienced during deployments or at previous duty stations.

268.     Plaintiff Shelby Kea has suffered chronic and recurring sinus infections throughout the tenancy, requiring repeated courses of antibiotics and medical treatment.

269.     Minor Plaintiff H.K. suffered allergy-like symptoms year-round with constant congestion and respiratory issues, and has been diagnosed by a pulmonologist with "inducible laryngeal constriction"—a respiratory condition consistent with chronic irritant exposure such as mold.

270.     Minor Plaintiff W.K. suffered chronic respiratory problems immediately upon occupancy.

271.     As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

272.     Virtually all of the Keas' furniture and belongings were purchased during their tenancy in the contaminated home and are now mold-contaminated, requiring disposal and replacement at significant cost.

273.     Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

274.     Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

275.     Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

276.     Although the Keas moved into the property in August 2020 and discovered the first visible surface mold in December 2020, they did not know and could not have reasonably known:

  a.   That the initial mold was caused by systemic, concealed construction defects rather than isolated moisture issues amenable to simple cleaning;

58

b. That the mold would recur continuously despite repeated maintenance responses, indicating an ongoing breach of habitability rather than a one-time problem;

c. That Defendants had constructed the home with multiple code violations including unsealed foundation, windows, doors, banding strips, and improperly ventilated attic spaces;

d. That the firewall between attached units was not sealed, causing cross-contamination and air pressure problems;

e. That their family members' health problems were causally related to mold exposure rather than seasonal allergies, viral infections, or other common childhood illnesses;

f. That Defendants were actively concealing evidence of construction defects by refusing to allow expert investigation and manipulating test results;

g. That Defendants' repeated representations that problems had been "fixed" were false and that Defendants knew or should have known the repairs were inadequate.

277. The full extent of Defendants' breaches and the causal connection to Plaintiffs' injuries were not discoverable until professional testing was conducted in 2023-2024 revealing the construction defects, and until the pattern of illness correlated with occupancy became undeniable (particularly Sergeant Kea's repeated illness upon return from deployments). Major discoveries continued through April 2025 when move-out revealed mold around all outlets and sprinkler heads. Under North Carolina's discovery rule, Plaintiffs' claims accrued progressively as the full scope of the concealed defects and resulting injuries became reasonably discoverable, with critical discoveries occurring in 2023, 2024, and 2025—well within the three-year limitations period.

278.     Additionally, Defendants' fraudulent concealment tolls any applicable statute of limitations. Defendants actively prevented discovery by: (1) refusing to allow expert investigation of air pressure problems in 2021; (2) pre-sealing the mechanical closet before HVAC testing to manipulate results; (3) attempting to avoid individualized testing; (4) repeatedly representing that surface repairs had resolved systemic problems; and (5) attributing mold to weather and tenant behavior rather than construction defects.

279.     Further, each month of continued occupancy in uninhabitable conditions constitutes a separate breach of the lease, the implied warranty of habitability, and statutory duties. Each rental payment made for substandard housing is a separate injury. Each exposure to mold constitutes a separate tortious injury, particularly as health impacts were progressive and cumulative. These continuing violations bring Plaintiffs' claims within the statute of limitations regardless of when the initial mold was discovered.

280.     Plaintiffs **Donovan McTague, Meredith McTague, and their minor child** rented a home from Defendants in Camp Lejeune in December 2021.

281.     At the time Plaintiffs McTague moved into the property, Defendants represented that the home was safe, clean, and habitable. Defendants failed to disclose the history of mold problems, water intrusion issues, or prior tenant complaints regarding the property.

282.     The McTague family's home was an attached townhome sharing a common wall with the Kea family's unit.

283.     Beginning in July 2023, Plaintiffs noticed water leaking from exhaust fans and visible mold growth in various places in the home.

284.     The McTagues repeatedly reported the mold and moisture problems to Defendants through their maintenance request system.

60

285.     Despite repeated requests, Defendants failed to:

    a.   Conduct proper mold testing or assessment by qualified professionals;

    b.   Remove mold-contaminated building materials;

    c.   Address the underlying moisture and ventilation problems causing mold growth;

    d.   Relocate the family during remediation;

    e.   Provide temporary housing; or

    f.   Take any action adequate to render the home safe and habitable.

286.     As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

287.     Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

288.     Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

289.     As a result of prolonged exposure to mold and related conditions, Plaintiffs McTague family members suffered physical and personal injury including chronic respiratory issues.

290.     Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

291.     Plaintiffs **Anthony Thomason, Samantha Sconish-Thomason and their minor child** rented a home from Defendants in Camp Lejeune beginning in January 2022.

61

292.     At the time Plaintiffs Thomason moved into the property, Defendants represented that the home was safe, clean, and habitable. Defendants failed to disclose the history of mold problems, water intrusion issues, or prior tenant complaints regarding the property.

293.     In approximately October 2022, several months after move-in, Plaintiffs first observed signs suggesting potential mold issues, including musty odors and condensation. At that time, Plaintiffs did not know and could not have reasonably known the full nature, extent, or cause of the mold contamination in the home. Defendants' representations that the home was safe and habitable, and Defendants' subsequent responses minimizing Plaintiffs' concerns and performing only superficial repairs, prevented Plaintiffs from discovering that the property suffered from systemic construction defects, hidden moisture intrusion, and pervasive mold contamination behind walls, in HVAC systems, and in other concealed locations.

294.     Upon discovering visible mold in October 2022, Plaintiffs acted as responsible, diligent tenants. They promptly reported the issues to Defendants through proper maintenance channels and complied with all Defendants' requests including purchasing and operating dehumidifiers, adjusting thermostat settings, and modifying household behaviors.

295.     From October 2022 onward, every time Plaintiffs reported mold concerns, Defendants engaged in a systematic pattern of minimization, dismissal, and blame-shifting, calling the visible black mold just dust or environmental growth, telling Plaintiffs they were not qualified to call it mold, telling Plaintiffs mold was normal for North Carolina and blaming Plaintiffs for not running exhaust fans.

62

296. Throughout the tenancy, Defendants engaged in systematic manipulation of maintenance and work order records to conceal the nature and extent of mold problems including mischaracterizing work orders as "carpentry" rather than mold remediation or water intrusion repair, preventing accurate tracking of mold complaints.

297. From October 2022 through 2024, Defendants responded to Plaintiffs' repeated complaints with a predictable cycle of superficial, inadequate repairs that never addressed root causes.

298. The full extent of the mold problems and Defendants' systemic failures to maintain the property only became reasonably apparent to Plaintiffs through ongoing and worsening conditions, repeated inadequate repair attempts by Defendants, progressive health deterioration of family members, and accumulation of evidence over time demonstrating that Defendants had knowledge of and concealed the true scope of the defects. Each month Plaintiffs continued to reside in the uninhabitable home, each rental payment made for substandard housing, and each new manifestation of mold or related defect constituted a separate breach of contract and separate injury.

299. Defendants repeatedly assured Plaintiffs that reported issues were minor, weather-related, or attributable to tenant conduct, and represented that repairs had been completed when in fact underlying moisture intrusion and mold contamination persisted. These misrepresentations and concealments prevented Plaintiffs from discovering the true nature and extent of Defendants' breaches and the resulting hazardous conditions until well after October 2022.

300. In September 2023, the Thomasons' minor child R.ST. suffered an acute, life-threatening medical crisis requiring ICU admission for respiratory failure and hypoxia. It

63

was only during and after this September 2023 medical crisis that Plaintiffs, for the first time, became aware of the strong and likely causal link between the persistent, concealed mold in the home and their child's injuries.

301.    As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

302.    Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

303.    Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

304.    As a result of prolonged exposure to mold and related conditions, Plaintiffs Thomason family members suffered physical and personal injury including respiratory issues.

305.    Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

306.    Under the discovery rule, Plaintiffs' claims did not accrue until they knew or reasonably should have known: (a) the mold was systemic and concealed, not just surface issues being addressed by repairs; (b) the causal connection between the mold and their child's serious health injuries; (c) that Defendants' repairs were deliberately inadequate and that Defendants were concealing the true nature of construction defects; and (d) the full extent of harm to their family and property.

307.    Additionally, Defendants' active fraudulent concealment independently tolls any applicable statute of limitations. Defendants:

64

a. Mischaracterized mold as "dust" or "environmental growth"

b. Systematically mislabeled work orders as "carpentry" instead of mold remediation

c. Refused to provide complete maintenance records and internal spreadsheets

d. Used generic environmental reports with other tenants' names rather than individual testing

e. Restricted access during repairs to prevent documentation

f. Made false representations that repairs had resolved problems

g. Attributed construction defects to tenant behavior and regional climate

308. These acts prevented Plaintiffs from discovering the full nature and extent of Defendants' breaches through reasonable investigation.

309. Each month of continued occupancy in uninhabitable conditions, each rental payment made for substandard housing, each exposure to mold, each failed repair attempt, and each act of concealment constitutes a separate breach of contract, separate tortious act, and separate injury. Under North Carolina's continuing violations doctrine, Plaintiffs' claims are timely regardless of when initial visible mold was observed because the breaches, injuries, and concealment continued through 2024 and 2025.

310. Plaintiffs **Canyon Wilder, Kate Wilder, and their minor children** rented a home from Defendants in Camp Lejeune beginning in December 2020.

311. At the time Plaintiffs Wilder moved into the property, Defendants represented that the home was safe, clean, and habitable. Defendants failed to disclose the history of mold problems, water intrusion issues, or prior tenant complaints regarding the property.

312. During the tenancy, Plaintiffs experienced a progressive series of problems that, over time, revealed systemic defects concealed by Defendants. In early 2021, Plaintiffs'

65

minor child began experiencing unexplained respiratory symptoms. Throughout 2021 and into mid-2022, Plaintiffs reported numerous maintenance issues including water leaks, dishwasher problems, pest infestations, and HVAC malfunctions. In July 2022, approximately 19 months after move-in, visible mold first became apparent when a ceiling leak resulted in water damage and Plaintiffs observed mold in the bathroom ceiling and other locations. At that time, Plaintiffs did not know and could not have reasonably known the full nature, extent, location, or cause of the mold contamination affecting the home.

313.    Defendants responded to Plaintiffs' July 2022 mold complaints by performing superficial cleaning, spraying surfaces, and falsely representing that the mold was caused by weather and tenant failure to run exhaust fans. Defendants' representatives told Plaintiffs that maintenance workers were instructed not to use the word "mold" in work orders. These responses concealed the true nature of the problem and prevented Plaintiffs from understanding that the home suffered from systemic construction defects, inadequate insulation, hidden moisture intrusion, and pervasive mold contamination in concealed locations.

314.    The true scope of the mold problem was not and could not have been reasonably discovered by Plaintiffs until September 2022, when an environmental inspector accessed areas not visible to tenants and discovered mold throughout ventilation systems, lack of insulation behind exterior walls, an HVAC wire leak inside the wall, gaps between ceiling and vents allowing mold spores to enter living spaces, and other systemic defects. Even then, Defendants misrepresented the severity of the contamination and the adequacy of remediation.

66

315.    In July 2023, nearly one year after the initial visible mold discovery, when Plaintiffs attempted to change an HVAC filter, they discovered for the first time that the filter was soaking wet, that black mold was present in the top and bottom corners of the mechanical closet, that insulation was exposed, and that the wood blocks supporting the HVAC unit were rotted and mold infested. This discovery revealed that despite Defendants' prior representations that mold issues had been remediated, systemic moisture intrusion and mold contamination had persisted and worsened in concealed locations throughout Plaintiffs' tenancy. This was the first time Plaintiffs could reasonably have discovered the full extent of Defendants' systemic failures, fraudulent concealment, and the resulting hazardous conditions.

316.    Throughout the tenancy, Defendants actively concealed the scope and severity of mold contamination through false and misleading statements, inadequate and superficial repairs that did not address root causes, manipulation of work order descriptions, failure to conduct proper mold testing, use of inadequately trained personnel, and refusal to provide Plaintiffs with complete information about the property's condition and history. Each month Plaintiffs continued to reside in the uninhabitable home, each rental payment made for substandard housing, each new manifestation of mold or related defect, and each act of concealment by Defendants constituted a separate breach of contract, separate tortious act, and separate injury.

317.    As a result of Defendants' failure to provide habitable housing, Plaintiffs lost personal property including but not limited to furniture, clothing, children's toys, and household items, which had to be discarded due to mold contamination.

67

318. Throughout their tenancy, Plaintiffs paid their full Basic Allowance for Housing amount for housing that was not safe, habitable, or worth the amount charged.

319. Plaintiffs incurred out-of-pocket expenses including but not limited to air purifiers, cleaning supplies, storage costs, replacement property, etc.

320. As a result of prolonged exposure to mold and related conditions, Plaintiffs Wilder family members suffered physical and personal injury including respiratory issues.

321. Plaintiffs suffered significant emotional distress, loss of quality of life, fear for their children's health, inability to have visitors to their home, and disruption of family life.

322. Since taking control of housing at MCB Camp Lejeune, Defendants have received numerous complaints and repair requests from Plaintiffs, evidencing widespread and systemic defects in the housing. However, Defendants have systematically failed to promptly and permanently repair and remediate the housing. The specific experiences of each Plaintiff family reflect uniform policies, practices, and funding decisions made by Defendants that affected all tenants. These include: (a) inadequate funding for maintenance and repairs; (b) use of poorly trained and underpaid workers; (c) impossible productivity metrics requiring superficial repairs; (d) financial incentives that rewarded data manipulation over problem-solving; (e) tolerance of false maintenance records; (f) manipulation of satisfaction surveys; (g) dismissive treatment of tenant complaints; (h) blame-shifting to tenants; (i) superficial repairs that didn't address root causes; and (j) refusal to offer adequate compensation despite admissions that conditions were "unacceptable."

323.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

324.    All claims asserted in this Complaint are timely under applicable statutes of limitation. To the extent any Defendant contends otherwise, Plaintiffs plead the following:

    a.  The acts and omissions giving rise to Plaintiffs' claims constitute continuing violations that were ongoing throughout Plaintiffs' tenancies and continued through the present;

    b.  Defendants' fraudulent concealment of known defects, mold contamination, and housing conditions tolled any applicable statutes of limitation;

    c.  Defendants' continuing representations regarding habitability and continuing promises to remediate conditions tolled applicable statutes of limitation;

    d.  The discovery rule tolled applicable statutes of limitation because Plaintiffs could not reasonably have discovered the full extent of Defendants' wrongful conduct, systematic practices, and concealment until after they moved into the properties and experienced the conditions firsthand;

    e.  Each rental payment made for uninhabitable housing constitutes a separate breach of contract and violation of statutory duties, giving rise to claims accruing with each payment;

    f.  Each instance of exposure to mold and hazardous conditions constitutes a separate injury supporting negligence claims;

    g.  Each repair request met with inadequate response constitutes a separate breach of duty; and

69

h. To the extent any statute of limitations would otherwise bar recovery for any claim, such limitations period is equitably tolled by Defendants' misconduct.

325. To the extent Defendants contend any claims are time-barred, Plaintiffs invoke the discovery rule recognized in *Chisum v. Campagna*, 378 N.C. 456 (2021), and allege that the statute of limitations did not begin to run until Plaintiffs knew or reasonably should have known of (a) the existence of mold contamination in concealed locations throughout the premises; (b) the systemic nature of the construction defects, moisture intrusion, and HVAC failures causing the mold; (c) the causal connection between the property conditions and their families' health problems; (d) Defendants' knowledge of these conditions prior to and during the tenancy; and (e) Defendants' pattern of fraudulent concealment, misrepresentation, and inadequate remediation. Discovery of these facts occurred progressively over time and was not complete until environmental inspections and expert analysis revealed the full scope of the concealed defects, which for some Plaintiffs did not occur until 2023.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT

326. Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

327. Plaintiffs entered into written lease agreements with Defendants for residential housing at MCB Camp Lejeune.

328. The leases and incorporated materials imposed duties on Defendants, as owners and property managers, to ensure the units were fit for human habitation, including: (a) delivering and maintaining the premises in safe, clean, and habitable condition; (b)

70

performing repairs and maintenance; (c) properly responding to mold and moisture intrusion; (d) exercising entry rights to inspect and repair; (e) relocating Plaintiffs when units became uninhabitable; and (f) not interfering with Plaintiffs' rights to enjoy the premises. The leases warranted that units were reasonably safe and habitable for occupancy.

329.     Defendants breached the leases by: (a) delivering premises with defective conditions including mold, moisture intrusion, insects, and defective HVAC systems; (b) failing to ensure the houses were fit for human habitation; (c) failing to make repairs and remedy conditions affecting habitability despite actual and constructive notice of the defective conditions; (d) renting and maintaining the premises in dangerous and uninhabitable conditions in violation of North Carolina Building Codes and applicable standards; (e) failing to relocate Plaintiffs; and (f) interfering with Plaintiffs' rights to enjoy the premises and forcing Plaintiffs to terminate their leases.

330.     Defendants are jointly and severally liable as they were directly and materially involved in performing under the lease contracts.

331.     Every contract carries an implied covenant of good faith and fair dealing. Defendants breached this covenant by: (a) failing to act fairly and in good faith in performing under the residential leases; (b) failing to make reasonable efforts to keep units safe and habitable; (c) failing to provide adequate repair and maintenance services; (d) failing to provide honest information to tenants; and (e) using their vastly more powerful economic position to oppress and intimidate Plaintiffs and their families.

332.     As a direct and proximate result of Defendants' breaches, Plaintiffs sustained damages including: (a) overpayment of rent for substandard, uninhabitable housing; (b)

71

out-of-pocket expenses for repairs, assessments, and cleaning; and (c) other consequential damages.

333.     Plaintiffs are entitled to compensatory damages, consequential damages, reasonable attorney's fees and costs, and all other relief the Court deems appropriate.

WHEREFORE, Plaintiffs request judgment against Defendants for all actual and consequential damages, attorney's fees and costs as provided by law, and all other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE / PREMISE LIABILITY

334.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

335.     Defendants were directly and materially involved in managing the residential leased properties at MCB Camp Lejeune and owed a duty to act with due care to Plaintiffs regarding residential repair, maintenance, and property management services.

336.     Defendants owed duties to Plaintiffs, including to: (a) communicate truthful information regarding known defects in the housing; (b) respond promptly, effectively, and truthfully to concerns about the condition of the units; (c) faithfully observe and comply with all applicable federal, state, and local laws, rules, regulations, ordinances, and other governmental standards; (d) maintain leased houses in good order and in a decent, safe, and sanitary condition; (e) respond competently and reasonably to tenant requests and complaints; (f) inspect the premises for defective conditions; (g) inspect for proper construction preventing excess humidity, moisture retention, and mold; (h) obtain appropriate testing after being notified that mold was likely present; (i) take appropriate

actions to remediate mold and other defective conditions; and (j) completely, properly, and appropriately repair or remediate mold, construction defects, and humidity retention.

337.    Defendants breached these duties by: (a) failing to communicate truthful information regarding the housing; (b) failing to respond promptly, effectively, and truthfully to concerns about unit conditions and providing misinformation in response; (c) failing to maintain leased houses in good order and in a decent, safe, and sanitary condition; (d) failing to protect Plaintiffs from water intrusion and mold; (e) failing to act reasonably in responding to mold complaints; (f) failing to inspect for defective conditions or proper construction; (g) failing to obtain appropriate testing after being notified that mold was likely present; (h) failing to take appropriate actions to remediate mold; (i) failing to completely, properly, and appropriately repair or remediate mold, construction defects, and humidity retention; and (j) other actions or inactions that may be learned through discovery.

338.    Defendants' breaches of duty constitute negligence, gross negligence, negligence per se, and/or reckless and willful conduct.

339.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered damages including: (a) severe and painful personal injuries; (b) medical expenses; (c) loss of income; (d) loss of personal property; (e) pain and suffering; (f) expenses related to mold abatement, repairs, assessments, and cleaning; and (g) other damages alleged herein and which may be uncovered during discovery.

340.    But for Defendants' negligence, Plaintiffs would not have sustained these damages.

341.    To the extent Defendants' conduct was undertaken intentionally or with reckless disregard for the foreseeable consequences to Plaintiffs, and the requirements of N.C. Gen.

Stat. § 1D-1 et seq. have been met by the evidence, Plaintiffs are entitled to exemplary or punitive damages.

WHEREFORE, Plaintiffs request judgment against Defendants for all compensatory damages, exemplary or punitive damages as appropriate, and all other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### FRAUD / FRAUDULENT MISREPRESENTATION

342.    Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

343.    Defendants made the following false representations of material fact to Plaintiffs:

    i.  Defendants represented through marketing materials, websites, and direct communications to prospective tenants that the residential units at MCB Camp Lejeune were high-quality, safe, well-maintained, and habitable housing suitable for military families;

    j.  Defendants represented that units had been properly inspected, repaired, and maintained, including after previous tenant complaints about mold, water intrusion, and HVAC defects;

    k.  Defendants represented that when Plaintiffs reported maintenance issues, repairs would be completed promptly and effectively;

    l.  Defendants concealed and failed to disclose known defects, including the history of mold problems, water intrusion, and inadequate remediation in specific units prior to Plaintiffs' occupancy;

    m.  Defendants misrepresented the results of mold testing and the effectiveness of mold remediation work performed;

74

n. Defendants represented that resident satisfaction surveys accurately reflected tenant experiences when Defendants knew the survey methodology was designed to avoid negative feedback and mask actual conditions.

344.     At the time Defendants made these representations, Defendants knew they were false or made them recklessly without regard to their truth or falsity. Defendants had actual knowledge of widespread mold problems, ineffective remediation practices, inadequate vendor training, and a pattern of complaints from prior tenants about the same units.

345.     Defendants made these false representations with the intent to induce Plaintiffs to enter into lease agreements, continue occupying the premises, and refrain from pursuing legal remedies.

346.     The false representations were material to Plaintiffs' decisions to lease the properties and remain in occupancy.

347.     Plaintiffs did not know these representations were false and had no reasonable means to discover the truth, as Defendants controlled access to inspection reports, prior tenant complaints, mold test results, and remediation records.

348.     Plaintiffs justifiably relied on Defendants' representations in deciding to enter and maintain the lease agreements. Such reliance was reasonable given Defendants' superior knowledge of the properties' condition and history, Defendants' role as property managers with expertise, and servicemembers' limited housing options at military installations.

349.     As a direct and proximate result of Plaintiffs' reliance on Defendants' fraudulent misrepresentations, Plaintiffs suffered damages including: (a) overpayment of rent for substandard housing; (b) out-of-pocket expenses for repairs, assessments, and cleaning; (c)

medical expenses; (d) property damage; (e) pain and suffering from mold-related injuries; and (f) economic losses from lease obligations for uninhabitable premises.

350.     Defendants' fraudulent conduct was committed willfully and with malice, entitling Plaintiffs to punitive damages pursuant to N.C. Gen. Stat. § 1D-1 et seq.

WHEREFORE, Plaintiffs request judgment against Defendants for all compensatory damages, punitive damages pursuant to N.C. Gen. Stat. § 1D-1, and all other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

351.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

352.     Defendants, as property managers and landlords with special expertise in residential property management, owed a duty to Plaintiffs to exercise reasonable care and competence in obtaining and communicating information regarding the condition, safety, and habitability of the residential units.

353.     Defendants negligently supplied false information to Plaintiffs regarding the following material facts:

o.   The safety and habitability of the residential units at MCB Camp Lejeune;

p.   The existence, extent, and severity of mold contamination in specific units;

q.   The effectiveness of mold remediation and repairs that Defendants represented had been completed;

r.   The results of mold testing and air quality assessments;

s.   Defendants' maintenance practices and response times to repair requests;

76

t. The compliance of units with applicable building codes, health standards, and habitability requirements.

354. Defendants supplied this false information in the course of their business as property managers and landlords, and Plaintiffs were members of a limited group of persons (prospective and current military tenants) whom Defendants knew would rely on such information.

355. Defendants failed to exercise reasonable care in obtaining or communicating this information, including by: (a) failing to conduct adequate inspections; (b) failing to properly document or address prior complaints; (c) employing inadequate testing protocols; (d) using unqualified or inadequately trained vendors; (e) failing to verify the accuracy of information provided to tenants; and (f) failing to disclose material information within Defendants' knowledge.

356. Plaintiffs actually and justifiably relied on the false information supplied by Defendants in deciding to enter into and maintain lease agreements. Reliance was justifiable because Defendants possessed superior knowledge, expertise, and access to information about the properties' condition, and servicemembers have limited alternatives for housing at military installations.

357. As a direct and proximate result of Plaintiffs' reliance on Defendants' negligent misrepresentations, Plaintiffs suffered pecuniary loss and other damages including: (a) overpayment of rent exceeding the reasonable value of the deficient housing; (b) out-of-pocket expenses for repairs, testing, and remediation; (c) medical expenses; (d) property damage; and (e) economic losses from lease obligations.

77

WHEREFORE, Plaintiffs request judgment against Defendants for all compensatory damages and all other relief the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**UNFAIR AND DECEPTIVE TRADE PRACTICES (N.C. GEN. STAT. § 75-1.1)**

358.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

359.     Defendants were engaged in commerce in North Carolina by marketing, leasing, and managing residential rental housing at MCB Camp Lejeune. Plaintiffs are consumers under N.C. Gen. Stat. § 75-1.1 et seq., and lessees have standing to bring NC UDAP claims.

360.     Defendants are jointly and severally liable for NC UDAP violations as each was directly and materially involved in providing or managing the residential housing.

361.     Defendants engaged in unfair and deceptive trade practices affecting Plaintiffs, including:

   u. Leasing housing with defects, deficiencies, water intrusion, and mold contamination far exceeding acceptable standards;

   v. Marketing lease offerings with representations of excellent service, repair, and maintenance that were false;

   w. Collecting full BAH payments calculated for reasonable and safe housing while providing substandard housing;

   x. Conducting misleading resident satisfaction surveys and maintaining inaccurate repair records to avoid oversight;

   y. Breaching the implied warranty of habitability, the RRAA, and other laws as alleged in other claims.

78

362.     Defendants' conduct violated established public policy, was unethical, oppressive, unscrupulous, substantially injurious to consumers, and had the capacity and tendency to deceive.

363.     Defendants received numerous complaints and repair requests from Plaintiffs and prior tenants regarding the same conditions. Defendants had knowledge of historical defects in the properties while incoming tenants did not.

364.     Despite knowing the unacceptable and unsafe conditions, Defendants leased units to Plaintiffs while marketing the properties as safe, habitable, and well-maintained.

365.     Had Plaintiffs known the actual condition of the units and Defendants' practices, they would not have entered the leases.

366.     Defendants exploited their 50-year ground lease, information asymmetry, lack of transparency, servicemembers' weaker economic position, and lease-breaking restrictions to hold Plaintiffs in the leases despite substandard conditions.

367.     Defendants collected full BAH payments without providing discounts for the poor quality or inadequate maintenance.

368.     Defendants underpaid vendors, chose inadequately trained vendors, and imposed restrictions on repairs, causing moisture and mold problems to persist and recur while transferring costs to Plaintiffs.

369.     Plaintiffs suffered actual injury proximately caused by Defendants' unfair and deceptive conduct, including out-of-pocket expenses for repairs, assessments, and cleaning, plus overpayment of BAH rent relative to housing quality.

370.     Defendants' actions in or affecting commerce violated Chapter 75 of the North Carolina General Statutes.

79

WHEREFORE, Plaintiffs request compensatory damages, treble damages pursuant to N.C. Gen. Stat. § 75-16, reasonable attorney's fees and costs pursuant to N.C. Gen. Stat. § 75-16.1, and all other relief the Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**
**BREACH OF COVENANT OF QUIET ENJOYMENT / CONSTRUCTIVE EVICTION**

371.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

372.     Every lease contains an implied covenant of quiet enjoyment, by which the landlord covenants that the tenant shall have peaceful possession and beneficial enjoyment of the leased premises.

373.     Defendants breached the covenant of quiet enjoyment by engaging in acts and omissions that rendered the premises untenable and uninhabitable, including:

    z.  Failing to maintain the premises in a fit and habitable condition as required by law;

    aa. Allowing persistent mold, water intrusion, moisture retention, defective HVAC systems, and other hazardous conditions to exist and continue;

    bb. Failing to make adequate repairs despite repeated notice and requests from Plaintiffs;

    cc. Conducting ineffective or superficial remediation that failed to address underlying problems;

    dd. Exposing Plaintiffs and their families to health hazards including toxic mold;

    ee. Substantially interfering with Plaintiffs' use and enjoyment of the premises.

374.     Defendants' breaches of duty rendered the premises untenable—in such a condition that no tenant could reasonably be expected to remain in occupancy. The conditions created

substantial interference with Plaintiffs' use and enjoyment that would affect any reasonable person, not merely persons of particular sensitivities.

375.     Plaintiffs provided Defendants with notice of the defective conditions and allowed Defendants reasonable opportunity to remedy the problems, but Defendants failed to take adequate corrective action.

376.     As a result of Defendants' conduct rendering the premises untenable, certain Plaintiffs were constructively evicted and forced to abandon the premises within a reasonable time after the conditions became intolerable.

377.     Plaintiffs who abandoned the premises did so without fault on their part and were justified in doing so because of the untenable conditions created by Defendants' breaches.

378.     As a direct and proximate result of the constructive eviction, Plaintiffs who abandoned the premises were relieved of their obligations to pay rent for the period following abandonment and are entitled to damages including: (a) costs of relocation; (b) rent differential between abandoned premises and replacement housing; (c) out-of-pocket expenses incurred due to the defective conditions; (d) property damage; (e) medical expenses; and (f) other consequential damages.

379.     Plaintiffs who remain in occupancy despite untenable conditions continue to suffer damages from Defendants' substantial interference with their use and enjoyment of the premises.

WHEREFORE, Plaintiffs request judgment: (a) declaring that Plaintiffs who abandoned the premises are relieved of further rent obligations; (b) awarding all compensatory damages; and (c) granting all other relief the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

81

## NUISANCE

380.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

381.     Plaintiffs occupied the residential units and have standing to bring this claim based on their possessory and occupancy interests in the leasehold properties.

382.     Defendants improperly and unreasonably used and maintained their properties by allowing persistent mold, water intrusion, moisture retention, defective HVAC systems, and other hazardous conditions to exist and continue in Plaintiffs' residential units.

383.     Defendants' improper and unreasonable use of their properties substantially interfered with Plaintiffs' use and enjoyment of their leasehold properties. The interference was substantial in that it resulted in significant annoyance, material physical discomfort, and injury to Plaintiffs' health and property.

384.     As a direct and proximate result of Defendants' creation and maintenance of a temporary and recurrent private nuisance, Plaintiffs have been injured and suffered damages.

385.     The nuisance conditions are abatable. However, Defendants have unreasonably refused to abate them despite notice and opportunity to do so.

386.     Plaintiffs are entitled to compensatory damages and injunctive relief requiring Defendants to abate the private nuisance.

WHEREFORE, Plaintiffs request judgment against Defendants for all compensatory damages, injunctive relief ordering abatement of the nuisance, and all other relief the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF

82

## CLAIMS UNDER NORTH CAROLINA RESIDENTAL RENTAL AGREEMENTS ACT
## (N.C. GEN STAT. §§ 42-38, ET SEQ.)

387.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

388.     Plaintiffs' leases are governed by the North Carolina Residential Rental Agreements Act ("RRAA"), N.C. Gen. Stat. §§ 42-38 et seq.

389.     Under the RRAA and North Carolina common law, Defendants had a continuing duty to provide fit and habitable housing to Plaintiffs.

390.     Atlantic Marine Corps Communities, LLC, was the owner and contracting party under the leases and is subject to the RRAA. The other Defendants, jointly and severally, acted as property managers, contracting parties, or agents of the owner with actual or apparent authority to perform landlord obligations under the leases and RRAA.

391.     N.C. Gen. Stat. § 42-42(a) required Defendants to: (1) comply with current applicable codes governing residential construction; (2) make all repairs and do whatever necessary to put and keep the premises in a fit and habitable condition; and (3) within a reasonable time based on the severity of the condition, repair or remedy any imminently dangerous condition after acquiring knowledge or receiving notice.

392.     Defendants received numerous tenant complaints regarding residential problems and defects at MCB Camp Lejeune. Defendants had knowledge of the recurrent problems in the housing units; Plaintiffs did not. Plaintiffs have satisfied any applicable notice requirement under the RRAA.

393.     Defendants impliedly warranted to Plaintiffs that the leased premises were in fit and habitable condition. In fact, Defendants knew an unacceptably high proportion of units

83

had mold, insects, defective HVAC systems, and other deficiencies, yet held out their privatized housing at MCB Camp Lejeune as high-quality and safe.

394.     The units leased by Plaintiffs had moisture intrusion, mold, insects, defective HVAC systems, and other conditions threatening the health and safety of family members. Despite years of complaints and repair requests, Defendants failed to make reasonable efforts to repair and remedy the defective conditions.

395.     Defendants violated N.C. Gen. Stat. § 42-42 and breached the implied warranty of habitability, proximately causing injury to Plaintiffs.

396.     As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages including: (1) out-of-pocket costs for repairs, assessments, and cleaning; (2) costs representing the labor value of time consumed by residents repairing and maintaining units themselves; and (3) overpayment of BAH rent amounts exceeding the reasonable rental value of the units during occupancy.

397.     Plaintiffs are entitled to damages and declaratory, injunctive, or equitable relief to the extent not preempted by the federal enclave doctrine.

WHEREFORE, Plaintiffs request compensatory damages, declaratory and injunctive relief, and all other relief the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF

398.     Plaintiffs incorporate herein by reference all the allegations in the Complaint as if fully set forth herein.

399.    Plaintiffs who continue to lease and occupy residential units are entitled to declaratory relief construing the express and implied terms of the lease agreements and declaring the respective rights and duties of the parties.

400.    Plaintiffs are entitled to equitable and injunctive relief specifying Defendants' duties to provide adequate customer service, repair, and maintenance under the parties' agreements.

401.    Defendants knew or should have known the residential units were non-compliant with applicable federal, state, and local laws, regulations, ordinances, and standards, but failed to act appropriately under the obligations imposed by the lessor-lessee relationship.

402.    Available remedies at law are inadequate, particularly for Plaintiffs with currently ongoing leases, and injunctive relief is necessary to preserve the status quo pending final resolution of this action.

403.    Defendants collected significant BAH payments for providing deficient residential properties to servicemembers and their families. To the extent not subject to Plaintiffs' breach of contract claim, Plaintiffs conferred a benefit on Defendants that would be unjust to retain. Plaintiffs request equitable accounting, disgorgement, and restitution, including to the extent Defendants' revenues traceable to Plaintiffs' tenancies exceed the reasonable value of the leaseholds.

404.    Plaintiffs request that the Court enter equitable, declaratory, and injunctive relief: (a) construing the lease agreement terms and declaring the parties' respective rights and obligations; (b) enjoining Defendants from continuing violations of their landlord and property manager duties; (c) appointing a special master or auditor at Defendants' expense to engage in accounting and review of Defendants' property management practices; (d)

85

enjoining Defendants to correct misrepresentations on websites and marketing materials or to provide more complete and transparent disclosures to servicemember tenants and their families; (e) sequestering BAH payments under Court oversight; (f) ordering abatement of the private nuisance; (g) awarding disgorgement and full or partial restitution of monies to eligible servicemembers; and (h) awarding such other declaratory, injunctive, or equitable relief as the Court deems appropriate.

WHEREFORE, the Plaintiff prays unto the Court as follows:

1.    That the Plaintiffs recover of the Defendants compensatory damages in an amount in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as set forth herein.

2.    That the Plaintiffs recover of the Defendants punitive damages in an amount in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as set forth herein.

3.    That the Plaintiff recover prejudgment interest as allowable by law;

4.    That the cost of this action, including reasonable attorney's fees, be taxed against the Defendants;

5.    FOR A TRIAL BY JURY ON ALL ISSUES;

6.    Declaratory judgment construing the parties' lease agreements and declaring the respective rights and duties of the parties;

5.    Injunctive relief ordering Defendants:

    a.    To abate all nuisance conditions at the properties;

    b.    Requiring Defendants to properly remediate all mold, water intrusion, and uninhabitable conditions;

    c.    Ordering Defendants to implement adequate inspection, maintenance, and quality control procedures;

86

d.   Enjoining Defendants from continuing violations of their landlord and property manager duties;

e.   Requiring Defendants to provide accurate and complete disclosures regarding housing conditions to current and prospective tenants;

f.   Declaration that Plaintiffs who were constructively evicted are relieved of all further obligations under their lease agreements;

g.   Declaration that Plaintiffs who abandoned the premises due to uninhabitable conditions are entitled to a refund of rent paid during periods the premises were uninhabitable.

6.   For such other and further relief as this Court may deem just and proper.

This the 11th day of November, 2025.

MAST, JOHNSON, WRIGHT, BOOKER
& VAN PATTEN, P.A.
Attorneys for Plaintiff
One Courthouse Square
Post Office Box 119
Smithfield, North Carolina 27577
Telephone: (919) 934-6187


By:   ___/s/ Nichole G. Booker_____
Nichole G. Booker
State Bar No.: 32587